## RENFROE *et al.* v. CITY OF ATLANTA *et al.*

1. By article 7, section 7, paragraph 1, of the constitution of Georgia (Civil Code, § 6563) it is declared that no municipality shall incur any new debt, except for a temporary loan or loans to supply casual deficiencies of revenue, not to exceed one fifth of one per cent. of the assessed value of taxable property therein, without the assent of two thirds of the qualified voters thereof, at an election for that purpose, to be held as may be prescribed by law. It further prescribes a limit upon the amount of indebtedness which can thus be incurred.

2. By article 1, section 4, paragraph 2, of the constitution (Civil Code, § 6392) it is provided that "Legislative acts in violation of this constitution, or the constitution of the United States, are void and the judiciary shall so declare them."

3. A contract was entered into by the City of Atlanta and a private corporation, whereby the latter agreed to erect a crematory for the former, for a total price of $376,800, of which it was agreed that an installment of $50,000 should be paid in the year in which the contract was made, and that the balance should be paid in installments of $75,000 each, except the last, extending through a series of years; that the installments to be paid annually should bear interest at the rate of six per cent. from the time when they fell due; that the city pledged its good faith for their payment; that the term "good faith" was understood to mean that the city could not bind itself to pay beyond the current

year, but the mayor and general council of that year by resolution recommended to the mayor and general council of succeeding years to make appropriations to cover the deferred payments specified in the contract; and that, if a default in the payment by the city of any future installment of the purchase-money should be made, this should, without any legal process whatever, transfer the possession of the plant to the contractor company, and that the company should "immediately become vested with the title, possession, and control of said plant, exclusive of the land, as against the City of Atlanta, and said company shall have the right to operate the same free of rent, for its own account, for a period of ten years from the date of such default." *Held*, that by such contract it was sought to create a debt within the meaning of the constitutional provision on that subject set out in the first headnote; and being entered into without submitting the question to a preliminary vote of the people, it was invalid.

4. Taxpayers of the city have such an interest in the municipal funds arising from taxation that they may enjoin the creation of illegal debts by the corporation, or their payment.

5. Nothing in this decision prevents the mayor and council of the City of Atlanta from erecting a crematory in such manner as will not violate the constitution, or from submitting to the qualified voters the question of whether the city shall incur an indebtedness for the purpose of erecting a crematory, or from incurring such indebtedness if duly authorized by the voters in the manner prescribed by the constitution. But the city and the contractor must be enjoined from creating a debt on the part of the city without the authority of the qualified voters, and from carrying out a contract entered into without such lawful authority which will have that effect.

MAY 28, 1913.

Petition for injunction. Before Judge Bell. Fulton superior court. March 11, 1913.

*C. P. Goree,* for plaintiffs. *J. L. Mayson, W. D. Ellis Jr.,* and *Evins, Spence & Moore,* for defendants.

FISH, C. J. Certain citizens and taxpayers of the City of Atlanta, in behalf of themselves and such others similarly situated as might desire to become parties plaintiff, brought a petition against the city and certain named officers thereof, and the Destructor Company, a corporation, to enjoin the defendants from carrying out a contract entered into between the city and the Destructor Company for the erection of a crematory by the company for the city, on the ground, among others, that the contract was void for the reason that it was an effort to create a debt against the city without complying with the constitutional provisions requiring the assent of two thirds of the qualified voters of the city, expressed at an election held for the purpose of determining

whether the debt should be created. An interlocutory injunction was refused, and the plaintiffs excepted. So much of the contract as is necessary to be considered in deciding the case will be hereinafter set forth.

The first section of our Civil Code enumerates the laws of general operation which are of force in this State. After referring to the constitution of the United States, the laws of the United States passed in pursuance thereof, and treaties made under the authority of the United States, the next item enumerated is with reference to the local laws of the State, and the constitution of this State is declared to be the supreme law therein next in order. Thus, at the very threshold of the Code of Georgia, the constitution and its provisions are declared to be the supreme law, to which other laws must yield if they are in conflict therewith. At the close of the Civil Code are placed the constitution of the State and that of the United States. It is significant that the beginning and the end of the law for the protection of the citizens, as embodied in the Civil Code of the State, are its constitutional provisions; and that at the beginning and at the end—the Alpha and Omega—of that code, stands the declaration of the supreme law of the constitution as a safeguard and fundamental guaranty of the rights of person and property. Once let it be understood that the constitution can be violated or evaded at will, and no law of lesser force can be safe from a similar fate.

By article 7, section 7, paragraph 1, of the constitution of this State (Civil Code, § 6563), it is declared: "The debt hereinafter incurred by any county, municipal corporation, or political division of this State, except as in this constitution provided for, shall not exceed seven per centum of the assessed value of all the taxable property therein, and no such county, municipality, or division shall incur any new debt, except for a temporary loan or loans to supply casual deficiencies of revenue, not to exceed one fifth of one per centum of the assessed value of taxable property therein, without the assent of two thirds of the qualified voters thereof at an election for that purpose, to be held as may be prescribed by law," etc. By section 10, paragraph 1, of the same article (Civil Code, § 6567), it is declared: "Municipal corporations shall not incur any debt until provision therefor shall have been made by the municipal government." In article 1, section 4, paragraph 2 (Civil Code, § 6392),

it is declared: "Legislative acts in violation of this constitution, or the constitution of the United States, are void, and the judiciary shall so declare them." Here we have in the fundamental law, where rights and limitations are deliberately declared, not in the heat of political excitement, or the haste of mass meetings, or the like, but in the calm consideration of the people's representatives, formulating fundamental regulations for the protection of their persons and property even against hasty legislation or inconsiderate action by legislatures or municipal authorities, a limitation upon municipalities in regard to the creation of debts; and municipal councils are prohibited from creating debts without the consent of the taxpayers duly expressed. This constitutional provision is not a mere arbitrary or technical declaration of a rule of procedure, but it is a substantial protection to the taxpayers of a community against the action of municipal authorities, who are, at last, but the agents and servants of the people, if they seek to impose indebtedness upon the taxpayers without their consent.

This provision of the constitution was not hastily declared or based on mere theory, but it grew out of the sad experience of the past, and was intended to prevent a repetition of it in the future. In *Walsh* v. *City Council of Augusta*, 67 *Ga.* 293, Chief Justice Jackson said (p. 299): "What was the evil? It was the evil attendant upon all people who handle money not their own. The cities of the State incurred a very heavy indebtedness—some of them became insolvent. To levy taxes enough to pay them would work the ruin of the citizens and blight the prosperity of the city. Not to levy and pay them would be to destroy credit and soil honor. The cities are the arteries of the body politic. With them destroyed or sluggish, the heart, the very life, of the republic would cease to beat or pulsate with a feeble supply of vital fluid. So that in their health is involved that of the entire commonwealth, and to suffer their honor to be tarnished is to soil that of the State." See also the remarks of Mr. Justice Cobb on the same subject in *City of Dawson* v. *Dawson Waterworks Co.*, 106 *Ga.* 696-704 (32 S. E. 907), et seq.

It is well to mention, as a part of the history of the adoption of this constitutional provision in its present form, that in the constitutional convention of 1877 a committee reported the paragraph with a provision contained therein giving to such corporations the

power to increase their indebtedness to an amount not exceeding two per cent. upon the amount of taxable property therein, without the assent of two thirds of the qualified voters thereof. Mr. Mynatt, who was a member of that convention, one of the representatives for the County of Fulton and the City of Atlanta as a part of that county, opposed the inclusion in the section of any such power, and offered a substitute therefor which prevailed, and the paragraph was adopted as it now appears in the constitution. In the course of his argument on the subject Mr. Mynatt said: "Now, sir, we have fifteen millions of property in the City of Atlanta, and two per cent. on it would be three hundred thousand dollars, which the city council can involve us in every year. They can ruin us without asking permission. I move to amend by striking out in the fourth line the words: 'or increase its indebtedness to an amount exceeding two per cent.,' and inserting in lieu thereof the following words: 'except for a temporary loan or loans to supply casual deficiencies of revenue, not to exceed one fifth of one per cent.' The one fifth will amount in the City of Atlanta to thirty thousand dollars, the amount which the city council may borrow for the purpose of supplying casual deficiencies in the collection of taxes. I think they should not be allowed to borrow any money whatever unless it is for this purpose, and then when the money is collected it is to be paid back. Let us not empower them to involve us in any increased indebtedness at all. I propose to stop the city council at that point, and not allow them to create a debt upon the people." A member of the convention asked the speaker: "Does not your city charter restrict the council in this matter of increasing the public debt?" Mr. Mynatt replied: "It does, sir." His interlocutor then asked: "Under that restriction, then, can they borrow any money at all?" Mr. Mynatt replied: "I think not, but I want it passed here in this convention that they shall not do it at all." Small's Debates of the Constitutional Convention, p. 306.

It will thus be seen that not only was it deliberately considered by the constitutional convention, representing the people of the entire State that this restriction should be put upon municipal councils, but that a representative of the people of Atlanta and Fulton County emphasized and insisted upon the importance of making this a constitutional limitation, and not leaving it to the

legislative prohibition contained in the charter of the city. That convention and those representatives knew full well the conditions to which Chief Justice Jackson referred in the excerpt from his opinion above quoted, and they determined to place it in the fundamental law that such a situation should not again be brought about by a municipal council. It is unnecessary to discuss here the meaning of the words "casual deficiency," further than to say that they are not involved in the present question, and that they have received a fixed construction and declaration as to what they mean and what can be done under them. The constitutional plan was to pay current expenses each year from funds belonging to that year. *Butts County* v. *Jackson Banking Co.*, 129 *Ga.* 801 (60 S. E. 149, 15 L. R. A. (N. S.) 567, 121 Am. St. R. 244).

The condition of affairs above mentioned, and the placing of constitutional limitations upon the power of municipal corporations to contract indebtedness or impose liabilities upon the taxpayer, were not confined to Georgia, but similar conditions occurred in a number of States, and constitutional limitations upon municipal councils were correspondingly imposed.

Let it be distinctly understood, and let there be no mistake, that the question before this court is not whether a crematory is desirable for the City of Atlanta, or whether a crematory can be built. This court in no manner declares that the City of Atlanta can not have a crematory. On the contrary, it can have a crematory, and can contract an indebtedness therefor, if it is deemed desirable, by pursuing the method pointed out in the constitution. The question is not whether the city can have or should have a crematory, but whether the municipal council can impose on the taxpayers an indebtedness to pay for a crematory, without the consent of the taxpayers expressed in the manner required by the constitution of the State; and whether the city council have undertaken to do this in substance. It must not be forgotten that the people are the sovereigns, and that the mayor and councilmen are but their agents elected to represent them. The former are the masters, the latter the servants. The sovereign people have seen fit to prohibit not only the municipal authorities of Atlanta but those of all other cities of the State from incurring indebtedness except in the manner which the constitution provides. To allow municipal councils directly or by indirection to violate these con-

stitutional restrictions made by the people for their own protection would be to exalt the agent above his principal, the servant above his master.

It was claimed that there was a necessity for a crematory in order to protect the public health, and that prompt action was required. But this argument loses its force in the light of the facts. The contract now under consideration was proposed in the spring or early summer of 1912. After consideration by council, the contract was finally made in July, 1912. There was litigation in the effort to prevent the crematory which the city formerly had on the property where this one is sought to be erected from being removed, and it appears from the record that the work was not begun on the new crematory for some time, and that only $26,000 out of a total contract price of $376,800 had been expended by the contractor when the present litigation was instituted. The petition in this case was filed on February 25, 1913, the order of the judge of the superior court was passed on March 11, the transcript of the record was filed in the office of the clerk of this court April 10, and (neither side requesting an advancement of the hearing) it was argued on May 9, 1913, in this court. From this brief recital it will be seen that the matter has been pending before the council and the courts for more than a year. Section 403 of the Civil Code provides for holding an election to determine whether a municipality will incur an indebtedness, other than a bonded debt, upon giv- ing notice for thirty days preceding the date of the election. It is apparent that twelve times the requisite time for giving the notice and holding the election has elapsed, without the slightest effort to do so. In the meantime it appears that the mayor and certain members of the council and certain taxpayers have continuously insisted that the contract was void, and both the municipal council and the contracting party have acted with full knowledge of this fact, and of the fact that the mayor vetoed the action of council in making the appropriation to carry out the contract. So that it is perfectly clear that there has been ample opportunity to submit the question of incurring an indebtedness for this purpose to the people, that it could have been done long ago, and that any delay occurring is not to be charged to a want of time to make such a submission, but to the determination of the council and the contractor to make the contract without the sub-

mission. It can not, therefore, be placed either on the ground of the necessity of haste in protecting the public health or on the ground of lack of time for submitting the question to the people; but the case presents the bald question of whether the municipal council have the right to make this character of contract without submitting to the people the question of incurring the debt, or whether to do so is in violation of the constitutional provision above quoted.

Taking up the question then, not as a matter of municipal health or of municipal necessity, but as a question of the power of the municipal council to make this contract without a submission to the people, we will now consider the question whether the contract so made creates an indebtedness within the meaning of the constitutional prohibition on that subject. Numerous definitions of the word "debt" have been made, some of them quite restricted in meaning, and some of them quite broad. In determining whether or not the contract violates the provisions of the constitution on the subject of indebtedness, the question is not to be determined merely by prescribing any exact, exhaustive definition of the word "debt," covering all cases, and applying it as a verbal yardstick to the particular contract, but rather by considering the great beneficial purpose of the constitution and the intent of that instrument in making the provision. It is not so much a matter of nicety in definition of words as of substance in obeying the constitution. May we not, without sententiousness, say: Let him who standeth confidently upon a definition take heed lest he fall, since it has been wisely said: "Definition, simple, positive, hard and fast as it is, never tells the whole truth about a conception." In a note to Superior Mfg. Co. *v.* School Dist. No. 6, 37 L. R. A. (N. S.) 1054, the annotator says (pp. 1060, 1061): "In interpreting debt limit provisions in the constitutions of the States and local statutes and charters of municipal corporations, the conditions which existed prior to their enactment, which they were designed to remedy, should not be forgotten. It was not until the people in many States found themselves carried along by a wave of public extravagance which was likely to bring them to bankruptcy, that they determined to put an end to the danger by setting a limit to expenditures, in the constitutions themselves. The evil was one of extreme seriousness. The debt limit provisions were

written in the fundamental law to be obeyed. . . In the main the courts have shown a disposition to uphold the debt limit provisions in the spirit in which they were enacted, although various schemes have been devised to evade them." In *Walsh* v. *City Council of Augusta,* supra, Chief Justice Jackson, in dealing with this very clause of the constitution, said (p. 297) : "In order to arrive at the true construction of all statute law, whether organic and fundamental, or legislative, the cardinal rule, if there be ambiguity in the words, is to consider the old law, the mischief or evil, and the remedy."

In Pennsylvania the same conditions arose in municipalities as those above mentioned, and it was found necessary to place in the constitution a restriction upon the power of cities to contract debts. An effort was made to evade this provision of the constitution by making a contract which in some of its important features was remarkably similar to that under consideration. In the case of Brown *v.* City of Corry, 175 Pa. 528 (34 Atl. 854), it was held: "A contract by which W. was to construct a system of waterworks for a city, to be delivered to and operated by it when completed, requiring the city to pay him $6,000 annually for 20 years, and to deposit $3,000 annually for that time, to be given to him, with accrued interest, at the end of that period, and transfer of title to the waterworks then to be made to it, creates an indebtedness, within Const. art. 9, § 8, providing the debt of a city shall never exceed a certain limit, though the contract provides that the payments and deposits are to be made from the current revenues of the city, and not otherwise, and that, if said revenues are insufficient to meet the payments and deposits, the interest of the city in the works shall revert to W., and the contract be terminated." This was declared in a State in which it was held that a contract pertaining to ordinary expenses, but extending through a series of years, might be made; but it was said that such ruling did not apply to a contract of the character of that mentioned. In *City Council of Dawson* v. *Dawson Waterworks Co.,* supra, it was held in this State, that, "Without the preliminary sanction of a popular vote as required by the constitution, a municipal corporation can not contract for a supply of water, on the credit of the city, for a longer period than one year." So that the decision just above cited was made in a State in which a more liberal construction is given

in regard to contracts for water or light, extending through a series of years, than that declared in this State.

In Maryland it was declared by the constitution of 1867 that "no debt shall be created by the Mayor and City Council of Baltimore, unless it be authorized by an act of the General Assembly, and by an ordinance of the Mayor and City Council of Baltimore, submitted to the legal voters of the city, and approved by a majority of the votes cast." The mayor and council sought to avoid the restriction quoted, by pledging certain railroad stocks, with the agreement that the pledgee should look for the payment of the money exclusively to the stock pledged, and in no event was the city to be liable for the return or payment of any part thereof, even though the stock pledged should prove insufficient. It was held that the restrictive provision applied to such a contract, that it could not be thus evaded, and that the ordinance making provision therefor was void. Mayor and City Council of Baltimore *v.* Gill, 31 Md. 375. In the opinion Bartol, C. J., said (p. 287): "We hazard nothing in saying that no one can read it [the ordinance] without being impressed with the conviction that the city council must have been sensible of the difficulties which the constitution interposed in the way of such legislation, and that its phraseology was ingeniously chosen for the purpose of avoiding the restrictions imposed by that instrument. But in considering it, we must not forget that we are dealing with substance, not with form. It is the thing done, or sought to be accomplished, which must determine the question of the power of the mayor and city council to pass the ordinance. This depends upon the true construction, operation and effect of the whole ordinance, not upon the form or mere phraseology of some of its parts. . . Though in the title and body of the ordinance the word *invest* is used, and it purports to be a mere change of investment, it is impossible to shut our eyes to the fact that the whole scheme of the ordinance is to borrow the sum of one million of dollars, and to secure its repayment by hypothecating stock of the Baltimore & Ohio Railroad Company held by the city. . . It has been argued that no debt is created by the ordinance, because, by the second section, it is provided that the parties loaning the money shall look for its repayment exclusively to the stock pledged, and that in no event is the city to be liable or responsible for the return or repayment of any part thereof,

even though the stock pledged should prove insufficient. This provision was doubtless adopted for the purpose of avoiding the restriction imposed by the constitution. We think it altogether ineffectual for that purpose. A debt is money due upon a contract, without reference to the question of the remedy for its collection. It is not essential to the creation of a debt that the borrower should be liable to be sued therefor. No suit can be maintained against the State by one of its citizens, and yet debts are created by the State which it is bound in good faith to pay."

In Brown v. City of Boston, 179 Mass. 321 (60 N. E. 934), the facts were these: The city authorities of Boston desired to acquire certain land adjoining land of the city used for a hospital. The price of the land was $226,000. The borrowing capacity of the city under St. 1885, c. 178, limiting its indebtedness, was but little over $24,000, and it had no money in its treasury available for the purchase of the land. It was arranged with the owners of the land that they should mortgage it to third parties for $202,000 and the city should buy it, subject to the mortgages, for $24,000. The mortgages were to be payable three years after the conveyance to the city, with a privilege to the owners, their grantees and assigns, to pay them off before maturity. The city was not to be mentioned in the mortgages, and the deeds to the city were to contain the statement that the city· was not to be held liable in any way for. the payment of the mortgages or the interest thereon. Upon a petition of taxable freeholders of Boston to enjoin the city from carrying out the transaction, it was held, that the proposed action of the city must be enjoined as an attempted evasion of the statute of 1885, and within its prohibition; that the transaction was in substance and effect a purchase of the land by the city for the sum of $226,000, of which it was to pay $24,000 in cash and the rest in three years with interest, with the privilege of paying sooner, and this notwithstanding the fact that the city could not be sued for the balance of the purchase-money; the manner in which the indebtedness was created being immaterial, if the result was to subject the city to a present liability, direct or indirect, which the taxpayers eventually would be called upon to meet.

In Ironwood Waterworks Co. v. City of Ironwood, 99 Mich. 454 (58 N. W. 371), it was held that "Municipal corporations can not avoid restrictions upon the amount of indebtedness they may incur,

by purchasing property for public purposes subject to liens." In the opinion Grant, J., said (p. 460): "Obviously, the City of Ironwood will have no way to protect the property thus purchased, except by payment of the lien thereon. . . The city must pay the mortgage, or lose all the benefits to be derived from the purchase. It is expected and understood that it will pay it and the interest on it. Such was the evident intention of all parties." See Rodman *v.* Munson, 13 Barb. 63; Newell *v.* People, 7 N. Y. (3 Selden) 9; Earles *v.* Wells, 94 Wis. 285 (68 N. W. 964, 59 Am. St. R. 886); Reynolds *v.* Waterville, 92 Me. 292 (42 Atl. 553).

These authorities are sufficient to show that, in dealing with constitutional limitations upon the power of municipal corporations to incur indebtedness, courts incline to look to substance rather than to form, and not to allow the mandate of the constitution to be evaded either by mere plausible devices of language or by refined and hairsplitting definitions of the meanings of words, supported by references to dictionaries or to expressions of judges in discussing cases before them.

Counsel for defendants in error rely much upon the case of May *v.* City of Springfield, 64 Ill. App. 861. It is unnecessary to discuss that case at length. But it may be remarked that in the opinion it is said: "It is perfectly plain that it was not intended to bind the city to take the light for any particular time or to take the plant." In the case before us it is perfectly plain that it was the intention to bind the city to take the plant or to suffer loss. Again, that decision was not rendered by the highest court of the State, but by the Court of Appeals. Its reasoning does not seem in harmony with that of the Supreme Court in City of Joliet *v.* Alexander, 194 Ill. 457 (62 N. E. 861). In any event, it does not accord with the decisions which we have cited above, and which we believe to announce sound principles of law.

In the light of the foregoing discussion, let us see what were the provisions of the contract here involved, what was its real meaning and intent, and what did it undertake to accomplish. The Destructor Company made a proposition to the City of Atlanta to erect for the latter a refuse incinerating plant or crematory. The price stated for the completed plant was $376,800. On the 3d day of June, 1912, a resolution was adopted by the mayor and general council which contained, among other things, the following ex-

pressions: "That the proposal of the Destructor Company of New York for the erection and completion of an incinerating plant and plants for the generation of electric current, as per plans and specifications filed herewith and fully covered by item 1 of said proposal, at a cost of $376,800.00, payable not exceeding $50,000 during the year 1912, provided that any saving in the cost of the construction of the building from the amount provided therefor in said proposal shall inure to the benefit of the city, be and the same is hereby accepted. Resolved further, that the City of Atlanta hereby pledges its good faith to pay the balance of the cost of said construction, as follows: $75,000.00 in each of the years 1913, 1914, 1915, and 1916, remainder in the year 1917, deferred payments to bear interest from date same are due under estimate at not exceeding 6% per annum. The city reserves the right to pay one or all of said deferred payments on or before maturity. Resolved further that his honor the Mayor be directed to execute a contract in the name of the city, upon approval of the city attorney as to form." On July 15 an amendment to this resolution was approved, which contained, among other things, the following statement: "The deferred payments which the above-described resolution pledges the good faith of the City of Atlanta to make in the years 1913, 1914, 1915, 1916, and 1917 are hereby recommended to the mayor and general council of said years to be made on or before the 15th day of February in each of the aforesaid years, provided same are due under approved estimates. All deferred payments to bear interest at 6% per annum from the date of approved estimates, as provided in said original resolution and bid. . . Resolved: That the Destructor Company shall retain title to any and all material or other thing of value furnished by said Company to the City of Atlanta in accordance with its contract, before and after the same is erected into an incinerating or electric-generating plant upon a site furnished by the City of Atlanta, with the right of supervision over the operation of said plant by the board of health, until the city has made the final payments therefor. The Destructor Company shall be given no further remuneration for such supervision. The city shall pay all labor and operating costs of the plant in the same manner and method as though the Destructor Company did not have such supervision. . . Resolved further, that after the City of Atlanta has accepted said

plant as having been built in accordance with the specifications and as fulfilling all guarantees as to capacity, cost of operation, etc., and the operation of said plant has been taken over by the board of health, under the supervision of the Destructor Company, a default in the payment of any future installment of the purchase-money by the city shall ipso facto, without any legal process whatever, transfer the possession of the plant to the Destructor Company, and said Company shall immediately become vested with the title, possession, and control of said plant, exclusive of the land, as against the City of Atlanta, and said Company shall have the right to operate same, free of rent, for its own account, for a period of ten years from the date of such default." The contract entered into between the company and the city embraced these resolutions, and they contracted accordingly. It contained the following provisions (after providing for the payment of $50,000 in the year 1912) : "As to the remainder of the cost, under the plans herein provided for, the City of Atlanta hereby pledges its good faith to pay said contractor for same as follows, to wit: seventy-five thousand ($75,000.00) dollars on or before the 15th of Feb. in each of the years 1913, 1914, 1915, and 1916, and the remainder on or before the 15th of Feb., 1917; and recommendation has been made to the mayor and general council of said several years to make appropriations to cover said amount, provided same are due under approved estimates. All deferred payments to bear interest at the rate of six (6%) per cent. per annum from the date of approval of estimate as provided in original resolution and bid. The term 'good faith' is herein understood to mean that the city can not bind itself to pay beyond the current year, but the mayor and general council of 1912 by said resolution does hereby recommend to the mayor and general council of the succeeding years to make appropriations to cover the said deferred payments as above provided."

It is impossible to read this contract and these resolutions without seeing plainly that the intention of the parties was for the city to contract for the building and equipping of a crematory at a fixed price, a part of which was to be provided for and paid in 1912 and much the larger part of which was to be paid in installments in subsequent years; and that it was sought at least to pledge the good faith of the city for the payment of the future

installments.   It went even further; it provided that if any installment should not be paid, the company should at once be vested with the title, possession, and control (except as to the land), and that it should have the right to operate the plant for ten years for its own account, free of rent.   Thus the city might pay every installment but the last one; but if the council in that year conscientiously and correctly believed that the contract was illegal, and refused to violate the law as they saw it, the city would have neither its money nor a crematory.   This would be to apply not only moral but pecuniary coercion to future councils to force them to pay or lose and to take from the city its crematory and put it in the hands of the other party, by virtue of the terms of the contract.   To say that this creates no debt within the meaning of the constitution is simply to juggle with words.   We know of no law which authorizes a city council to pledge the good faith of the city for the payment of money in future years, any more than to mortgage the city hall for the same purpose.   The city's good faith is a great asset, and no council has the right to pledge it to evade the constitution.   Certainly no council has the right to admit that it can not bind future councils and yet to fix payments for future councils to make, and so arrange the contract that, if the future councils do not make the payments, moral and pecuniary loss will automatically fall upon the city, and it will be put to serious inconvenience.

Moreover, this contract bristles with other earmarks of creating an indebtedness.   It distinctly contracts for binding the city as to the manner of operation of the crematory in future years, and until final payment.   Future councils are left no discretion on the subject.   It is liberally interspersed with such words as "installments," "deferred payments," "when due," and the like, words peculiarly applicable to debt.   It provides that the installments shall bear interest from the time when they are due, at six per cent. per annum.   Whoever heard of a sum of money being due by one person to another and bearing interest from the date when due, and yet not being a debt?   Does any one think for a moment that this company contracted to take $50,000 for its crematory?   If not, is it not palpable that it was understood that the balance should be paid in other years, and that it was sought by a skilfully drawn contract to so provide as to force future councils, by arguments of morals and money, to pay them?   If the city council should incur

a debt, it would be none the less a debt by solemnly declaring that it was not such, or by resolving that it was constitutional.

If this constitutional restriction does not apply, then there is no restriction, and council can purchase millions of dollars of property, drain the treasury to make the first payments, provide for future payments, and coerce future councils to make them under penalty of losing both the good faith of the city and the installments already paid; and this is equally true of every municipality in Georgia. Then the taxpayers in future years must be burdened with taxes to meet these deferred payments, in the contracting for which they had no voice, as the constitution declared that they should. Besides, improvements in future years from regular income must be postponed to these payments, lest the city suffer in reputation or purse; or else the process of piling up installments which are not debts, but which must be paid, must be continued indefinitely. It was just such conditions which the constitution sought to prevent.

When read in the light of the facts of the case then under discussion, there is nothing in the decision in *City Council of Dawson* v. *Dawson Waterworks Company,* supra, or other cases preceding or following it, decided by this court, on which counsel for defendants in error rely, which conflicts with what is here held. Much stress was laid upon the following statement in the opinion of Mr. Justice Cobb in that case (106 *Ga.* 711) : "Debt, therefore, as used in the constitution, is to be understood as a liability which is undertaken and which must be discharged at some time in the future, but which is not to be discharged by a tax levied within the year in which the liability is undertaken. The purpose of the framers of the constitution was to prevent an accumulation of liabilities upon municipal corporations which could be enforced against such corporations in the future by the compulsory levy of taxes. . . If the character of the undertaking is such that he who deals with a municipal corporation can, under the contract, in the future, of his own volition, and without the consent and over the protest of the authorities of the municipality, place upon it a liability which must be discharged by the levy of a tax in the future, such an undertaking creates a debt within the meaning of the constitution of this State, and one of the very classes of debts which the constitutional provision was made to guard against."

The learned judge who wrote that opinion declared that if a contract could be made by which a contracting party had the right from year to year, by simple performance, to put himself in a position where he could demand of the authorities a discharge of the obligation, then the framers of the constitution did a vain and idle thing in placing in the fundamental law of the land the clause under consideration. A fair reading of that opinion will show that Mr. Justice Cobb was demonstrating the fact that an agreement of the character then before him did create a debt, but that he never intended to hold that such an agreement was the only one that would create a debt. The expression that such an undertaking was "one of the very classes of debts which the constitutional provision was made to guard against" shows that he did not consider that the constitution was confined to the particular class which he was then discussing. We have already undertaken to show that it is not essential that one should have the right to sue in order to create a debt; otherwise the State would never be a debtor as to individual bondholders, though it has millions of dollars worth of bonds outstanding. It is not the remedy that creates the debt, but the remedy is generally a method provided for collecting the debt. The substitution of the contractual remedy in lieu of the ordinary remedy by suit does not operate to prevent the amount which is to be collected from being a debt. Furthermore, we have already undertaken to show that this contract did seek to make the city liable in the future to make payments, to place future councils in the position where they must make the payments specified or must sacrifice for the city its good name, and also cause it to suffer pecuniary loss and embarrassment. This is probably quite as efficacious a mode of enforcing payment as a mere common-law suit.

The position of the defendants in error is not sustained by the rulings in the *Dawson Waterworks* case and other similar cases in this State, where water had been furnished under a contract for one or more years before any question of its validity had been made, and where it was held that in equity and good conscience the city should pay for the water actually used while the contract was supposed to be valid. In some States contracts like that involved in the *Dawson Waterworks* case are held valid on the theory that a municipality could contract for water to be furnished year by year, the furnishing of water being a matter of annual expenditure

7

and the city not exceeding the limitation upon such expenditure, and that it could therefore within that limit contract for more than one year. In this State, as already mentioned, it has been held that a municipal corporation could not contract for a supply of water on the credit of the city for a longer period than one year, without the preliminary sanction of a popular vote as required by the constitution. In the case last mentioned and others like it, where the city could have contracted for a supply of water for one year at a time, though the contract provided for more than one year, yet where the city actually used the water by the year, and all parties were acting in good faith, there was strong equitable ground for holding that during the time the water was so used, and before any question was made as to the validity of the contract, the water used should be paid for. From the time when the point was made that the contract for a series of years was invalid, it was held not to be binding as a contract. Had the point been made in limine, it would doubtless have been then declared invalid, just as it was so declared when the point was raised. In the case now before us there has been no furnishing of water or lights or similar matters of municipal use, which could have been procured as a part of the ordinary annual expenses for the year; but there is a contract for a plant at a bulk price, payable in installments. The point in regard to the illegality of the contract was made in the beginning, before the city had received or used anything, and before the city had paid anything. In fact it can be drawn from the record that there has been a constant fight to prevent the contract from being carried into effect, and an effort on the part of the Destructor Company to proceed with the contract and to enforce payment of the amounts provided therein, in spite of objections on the ground that the contract was illegal, in spite of the refusal of the mayor to sanction any payment under it, and in spite of the fact that citizens filed a proceeding to enjoin it. In other words, it has not furnished the city with water or light, or any similar thing of daily use by the city, and then had the point made that the contract was illegal. On the contrary, the company entered into a contract which, as we have endeavored to show, bore on its face an effort to evade the constitution and to make an illegal contract with the city, which would create a debt, without submitting the question to the qualified voters as the constitution requires. The difference between the situation of the Dawson Waterworks

Company as to water which it had furnished for the use of the city before any question was raised as to the validity of the contract, and the position of this company which has entered into a contract illegal on its face and has persistently insisted on its execution, is manifest. Nor is this like the *Butts County* case supra, where the original warrants were considered legal, and, though the contract to loan money to pay them was invalid, the bank which took them up and held them was treated as acquiring a species of equitable assignment.

It was argued that the contract had already been signed, and that the taxpayers who were plaintiffs had no right to an injunction. The injunction can not stop the signing of the illegal contract, but it can stop the carrying of the contract into effect, the illegal imposition of an indebtedness upon the city, and the illegal payment of such an indebtedness. It is too well settled by former decisions to require argument, that a taxpayer has such an interest in the municipality and its funds that he may enjoin the unlawful use of such funds. *Mayor &c. of Americus* v. *Perry,* 114 *Ga.* 871 (6), 884 (40 S. E. 1004, 57 L. R. A. 230) ; *Mayor &c. of Macon* v. *Hughes,* 110 *Ga.* 795 (36 S. E. 247) ; *Fluker* v. *City of Union Point,* 132 *Ga.* 568 (64 S. E. 648). The argument that because the city might make annual appropriations for the disposition of filth or refuse matter, it might make annual appropriations without regard to the contract, and therefore could make appropriations under the contract, is ingenious but unsound. The right to make annual appropriations for the discharge of municipal functions during the current year is an entirely different thing from the appropriating of money annually to pay an illegal indebtedness, contracted in bulk, but to be paid in annual installments. The entire case hinges about the question whether the contract under consideration attempts to create an illegal indebtedness on the part of the city; and we have sought to show that it does.

It follows from what has been said that the presiding judge erred in refusing to grant an interlocutory injunction. Such an injunction does not prevent the municipal council from submitting to the qualified voters of the city whether or not the city shall incur a debt for the purpose of erecting a crematory. . It enjoins the city and the Destructor Company from carrying into effect an illegal contract seeking to impose a debt upon the city.

*Judgment reversed. All the Justices concur.*