STATE PORTS AUTHORITY *v.* ARNALL, Governor, *et al.*

No. 15653.   JANUARY 7, 1947.

*Charles L. Gowen* and *Spalding, Sibley, Troutman & Kelley,* for plaintiff in error.

*Smith, Kilpatrick, Cody, Rogers & McClatchey,* and *Louis Regenstein Jr.,* for persons at interest not parties.

*Eugene Cook, Attorney-General, R. A. McGraw* and *C. E. Gregory Jr., Assistant Attorneys-General,* contra.

*W. S. Mann, James A. Branch, Thomas B. Branch Jr., George & John L. Westmoreland,* and *William G. Grant,* for persons at interest not parties.

CANDLER, Justice. (After stating the foregoing facts.) The act approved March 9, 1945 (No. 422, Ga. L. 1945, pp. 464-480), creating the State Ports Authority, is not under attack here. The Authority, by the terms of that act, was given broad and comprehensive corporate powers, perpetual existence, declared to be an instrumentality of the State of Georgia and a public corporation with the right to contract and be contracted with, sue and be sued, implead and be impleaded, and complain and defend in all courts of law and equity. Section 15 of the act creating the Authority provides: "It is hereby found, determined, and declared that the creation of the Authority and the carrying out of its corporate purposes is in all respects for the benefit of the people of this State and is a public purpose and the Authority will be performing an essential governmental function in the exercise of the power conferred upon it by this act." Among the many powers granted to the Authority, were the right to acquire, construct, equip, maintain, develop, and improve the harbors or seaports of the State and their port facilities; the right to acquire and hold in its own name by purchase, or condemnation, real property or rights of easement therein, or franchises necessary or convenient for its corporate purposes, and to use the same so long as its corporate existence shall continue, with the right to sell, lease, or make any contracts with respect to the use of same, and in any manner it deemed to the best advantage of the Authority; and if the Authority was of the opinion that it was expedient to construct any project on lands, the title to which was in the State of Georgia, the Governor was authorized to convey, for and on behalf of the State, title to such lands to the Authority upon payment to the State Treasurer, for the credit of the sinking fund of the State, the reasonable value of such lands, such reasonable value to be determined by three ap-

praisers to be selected by the Governor and the Chairman of the Authority; and to borrow money, not in excess of fifteen million dollars, for any of its corporate purposes, and issue negotiable revenue bonds payable from the earnings of the Authority, and provide for the payment of same and for the rights of the holders thereof. With respect to the negotiable revenue bonds authorized, section 6 of the act provides: "Revenue bonds issued under the provisions of this act shall not be deemed to constitute a debt of the State of Georgia or a pledge of the faith and credit of the State, but such bonds shall be payable solely from the fund hereinafter provided therefor from earnings, and the issuance of such revenue bonds shall not directly or indirectly or contingently obligate the State to levy or to pledge any form of taxation whatever therefor or to make any appropriation for their payment. Neither the State nor the Authority shall be obligated to pay the principal of or the interest on such revenue bonds except from earnings of the project or projects for which they shall be issued. All such revenue bonds shall contain recitals on their face covering the foregoing provisions of this section." Section 11 of the act provides in part: "But no holder of any such bond shall have the right to compel any exercise of the taxing powers of the State to pay any such bond or the interest thereon, or to enforce the payment thereof against any property of the State, nor shall any such bond constitute a charge, lien, or encumbrance, legal or equitable, upon any property of the State."

This court has consistently and uniformly held that revenue-refunding certificates or bonds issued by similar corporations, when payable solely and exclusively from earnings derived from the operation of its facilities, are valid obligations of the corporation and do not offend those provisions of the Constitution of this State prohibiting the creation of a debt. *State* v. *Regents of the University System,* 179 *Ga.* 210 (175 S. E. 567); *Williamson* v. *Housing Authority of Augusta,* 186 *Ga.* 673 (199 S. E. 43); *Miller* v. *Head,* 186 *Ga.* 694 (198 S. E. 680); *Lawson* v. *Moultrie,* 194 *Ga.* 699 (22 S. E. 2d, 592). In the instant case, we have a combined undertaking on the part of the State and the Authority to finance the acquisition, construction, equipment, maintenance, development, repair, and operation of the harbors or seaports of the State and their port facilities. Such an undertaking has not previously been before this court for decision. Act No. 516, approved January 30,

1946, amending the original act creating the Authority, authorized the State, under certain conditions, to pay all or a part of the cost of maintaining, repairing, and operating the port facilities to be acquired or constructed by the Authority; and Act No. 628, approved February 1, 1946, authorized and empowered the Governor to place at the disposal of the Authority all of the rentals to be received from the present lease of the Western & Atlantic Railroad from 1950 to the termination of the lease at the end of 1969, a sum amounting to approximately $10,800,000, for the purpose of better securing the payment of the revenue bonds of the Authority, which rentals when received by the Authority were to be used by it, together with the income received from the operation of its facilities, as a fund for the payment of its revenue-refunding bonds and the interest thereon. It is here contended that Acts 516 and 628 offend certain stated provisions of the present Constitution of this State. We shall now deal with the specific attacks made upon the constitutionality of the acts in question.

█ It is insisted that Acts Nos. 516 and 628 violate art. 7, sec. 3, par. 1, of the Constitution of 1945 (Code, Ann. Supp., § 2-5601), which provides: "No debt shall be contracted by, or on behalf of, the State, except to supply such temporary deficit as may exist in the treasury in any year for necessary delay in collecting the taxes of that year, to repel invasion, suppress insurrection, and defend the State in time of war, or to pay the existing public debt; but the debt created to supply deficiencies in revenue shall not exceed, in the aggregate, five hundred thousand dollars, and any loan made for this purpose shall be repaid out of the taxes levied for the year in which the loan is made." And it is insisted that Act No. 628 violates art. 7, sec. 3, par. 2, of the Constitution of 1945 (Code, Ann. Supp., § 2-5603), which provides: "The bonded debt of the State shall never be increased, except to repel invasion, suppress insurrection, or defend the State in time of war."

It is elementary, of course, that the State can not do indirectly that which it can not lawfully do directly. If the State may not lawfully do the things it is authorized to do under the act, then, of course, it may not lawfully do them through a corporation which is an instrumentality of the State exercising governmental functions. Art. 1, sec. 4, par. 2, of the Constitution of 1945 (Code, Ann. Supp., § 2-402), provides: "Legislative acts in violation of

this Constitution, or the Constitution of the United States, are void, and the judiciary shall so declare them." A law is void, or not void, as measured by this clause of the Constitution. *Wright* v. *Hardwick,* 152 *Ga.* 302, 316 (109 S. E. 903). Although it is the duty of the judiciary to declare void all legislative acts that violate the State Constitution, yet since the legislature, as well as the courts, is bound by the Constitution, and the members of that body, like ourselves, are sworn to maintain it, and all presumptions are in favor of the constitutionality of an act of the legislature, this court will not set aside a solemn act of that body in a doubtful case. *Macon & Western R. Co.* v. *Davis,* 13 *Ga.* 68 (8), 83; *Wright* v. *Hirsch,* 155 *Ga.* 229, 233 (116 S. E. 795). To authorize the court to set aside a statute as being repugnant to the Constitution, the conflict must be plain and palpable. *Brooks* v. *Mutual Loan &c. Ins. Co.,* 95 *Ga.* 178, 181 (22 S. E. 55); *Harrison* v. *Hartford &c. Ins. Co.,* 183 *Ga.* 1 (187 S. E. 648); *Coy* v. *Linder,* 183 *Ga.* 583, 585 (189 S. E. 26). In determining constitutional questions, like others, the courts are not permitted to concern themselves with the wisdom of the act, or to apply or obtrude the personal views of the judges as to such matters, but are confined to settled principles of law under the long-established general rule stated. The act creating the Authority, making it a body corporate and a separate entity from the State, by clear and unambiguous language provided that all debts incurred by it should be obligations of the Authority, to be discharged from income to be derived solely and exclusively from the operation of its facilities. It was expressly provided therein that the obligations of the Authority were not to be deemed directly, indirectly, or contingently those of the State. As thus created, the authority became a corporation very similar in many respects to the State Housing Authority and Regents of the University System of Georgia; and in discussing the debts of the latter corporation, in *State* v. *Regents of the University System,* supra, this court, speaking through Mr. Justice Bell, said: "The University corporation is not the State, or a part of the State, or an agency of the State. It is a mere creature of the State, and a debt of the creature does not stand upon a level with the creator." After it was determined by investigations conducted by the Authority that the income which could reasonably be anticipated from the operation of its facilities would not be sufficient to pay the

amount of bonds necessary to finance the project or projects of the Authority, the legislature by the acts in question undertook to change the whole scheme of financing the undertaking, and to obligate the State, under certain conditions, to pay all or a part of the cost of maintaining, repairing, and operating the project or projects of the Authority and to join with it in an obligation to pay the bonds of the Authority by placing at its disposal all of the rentals to be received from the lease of the Western & Atlantic Railroad, which, together with the income from the facilities of the Authority, were to be used for the purpose of paying the revenue bonds to be issued by it. Pursuant to these two acts, the Authority by resolution, by stipulations in its trust indenture, and by recitals contained in the face of the bonds being issued, proposed to represent to prospective purchasers of its bonds that the State was obligated to assist it in financing its undertaking to the extent authorized by the acts in question. Such a joint combination between the State and a corporation, such as the Authority is, to finance an undertaking for the ultimate benefit of the State has not heretofore been before this court. However, undertakings bearing some resemblance to that here under consideration were held invalid, because they created a debt against the municipality within the meaning of the Constitution, in *City Council of Dawson* v. *Dawson Waterworks Co.*, 106 *Ga.* 696 (32 S. E. 907) ; *Renfroe* v. *Atlanta,* 140 *Ga.* 81 (78 S. E. 449, 45 L. R. A. (N. S.) 1173) ; *Byars* v. *Griffin,* 168 *Ga.* 41 (147 S. E. 66) ; *Dorlch* v. *Southeastern Fair Association,* 182 *Ga.* 633 (186 S. E. 685) ; *Cartledge* v. *Augusta,* 183 *Ga.* 414 (188 S. E. 675). The decision in *Cartledge* v. *Augusta,* was planted on the cases of *Renfroe* v. *Atlanta,* and *Byars* v. *Griffin,* supra. To illustrate the extent to which this court has gone to guard against any violation of the constitutional provision against creating a debt, we quote from that opinion : "The city does not pay any money out of its treasury into the construction of the hydroelectric plant and distribution system. But the Augusta cànal, the present property of the City of Augusta, and the water therefrom will be an important part of the hydroelectric plant, without which the plant could not operate. The income from the sale of electric power generated by the plant can not in any sense be considered as produced solely by the power-house, generator, turbine, and transmission lines, exclusive of the canal and

water therein. The fact that at the present time the city may be deriving no income from the surplus water in the canal is, in our opinion, immaterial. The canal and the water are valuable property of the city. Other property will be combined with them to produce income from the whole. But the income from the entire development, canal, water and hydroelectric generating plant, and the distribution system, is charged with the payment of the revenue bonds to be issued and sold for the purpose of constructing the plant and system." In *Dortch* v. *Southeastern Fair Association,* supra, it appeared that the City of Atlanta owned certain realty used as an amusement park called Lakewood. The property was leased to the Southeastern Fair Association for a term of years. By an amendment to its charter, the city was authorized to borrow a stated sum of money to be repaid over a period of years, which was to be used "for the purpose of erecting buildings or beautifying or improving the grounds, or repairing, remodeling, or reconstructing the grandstand, race tracks, or any part or portion of the property covered by the lease between the City of Atlanta and said Southeastern Fair Association." As security for the loan, the city was authorized to pledge "all of the income received from the buildings, or the income received from the entire property covered by its lease with the Southeastern Fair Association." In that case this court held: "The making of a loan in the circumstances stated will create a debt. The fact that the city might not be generally bound for the debt beyond the assets pledged for its repayment would not change the character of the loan and prevent it from constituting a debt."

In *Renfroe* v. *Atlanta,* supra, this court said: "It is impossible to read this contract and these resolutions without seeing plainly that the intention of the parties was for the city to contract for the building and equipping of a crematory at a fixed price, a part of which was to be provided for and paid in 1912 and much the larger part of which was to be paid in installments in subsequent years; and that it was sought at least to pledge the good faith of the city for the payment of the future installments. It went even further; it provided that if any installment should not be paid, the company should at once be vested with the title, possession, and control (except as to the land), and that it should have the right to operate the plant for ten years for its own account, free of rent.

Thus the city might pay every installment but the last one; but if the council in that year conscientiously and correctly believed that the contract was illegal, and refused to violate the law as they saw it, the city would have neither its money nor a crematory. This would be to apply not only moral but pecuniary coercion to future councils to force them to pay or lose and to take from the city its crematory and put it in the hands of the other party, by virtue of the terms of the contract. To say that this creates no debt within the meaning of the Constitution is simply to juggle with words. We know of no law which authorizes a city council to pledge the good faith of the city for the payment of money in future years, any more than to mortgage the city hall for the same purpose. The city's good faith is a great asset, and no council has the right to pledge it to evade the Constitution. Certainly no council has the right to admit that it can not bind future councils, and yet to fix payments for future councils to make, and so arrange the contract that, if the future councils do not make the payments, moral and pecuniary loss will automatically fall upon the city, and it will be put to serious inconvenience."

The instant case differs on its facts from *Wright* v. *Hardwick,* 152 *Ga.* 302 (109 S. E. 903). In that case the legislature by act of 1921 (Ga. L. 1921, p. 230) authorized the Governor to make an outright sale of the rentals to be received from the lease of the Western & Atlantic Railroad for a limited period of time for the purpose of meeting and discharging the obligations of the State which had then been created and incurred, and for which appropriations had been made by law. In such circumstances this court held: "This legislative act does not seek to authorize the creation of a debt, but it is evidently designed to provide for the payment of debts owing by the State, and to accomplish this end it authorizes the sale of the State's right to receive the rentals of the Western & Atlantic Railroad for a limited period in the future."

In the case at bar, and under the provisions of Act No. 516, the legislature has undertaken to obligate the State, under certain conditions, to pay all or a part of the annual cost of maintaining, repairing, and operating the facilities of the Authority, a distinct corporate entity, from funds which will come into the treasury, either by taxes or otherwise, in future years, and for the use and benefit of a corporation having perpetual existence. In the view

we take of the act, it will create a debt within the meaning of the constitutional prohibition against incurring State debts, and is therefore repugnant to the Constitution. To say that the State may irrevocably, as is attempted here, obligate itself to assist from its general funds a distinct corporate entity, having perpetual existence, by paying all or a part of the cost of maintaining, repairing, and operating its facilities, and place at its disposal over a period of twenty years the approximate sum of $10,800,000 derived from the rental of its property to aid it in paying its bonded indebtedness, and at the same time not create a debt against the State within the meaning of the constitutional inhibition, is absurd.

Assuming, but not holding, that the State may under certain circumstances combine with a corporation exercising State governmental functions to finance its projects, Act No. 628 obligates the State to become jointly liable with the Authority for the payment of its revenue bonds to be issued for a use and purpose for which the State may not increase its bonded indebtedness under the Constitution. The State can not lawfully, under the constitutional prohibition against increasing its bonded indebtedness, except to repel invasion, suppress insurrection, or defend the State in time of war, do this for itself, and what it can not do for itself, it most certainly may not do for others. If the State can not under constitutional inhibitions increase its bonded indebtedness for the purposes undertaken by the Authority, and this it can not do, then it would be ridiculous to say that it may create a separate corporate entity and under the guise of assistance to it, do that which it may not directly do.

It is also insisted that Acts Nos. 516 and 628 violate the provisions of art. 7, sec. 9, par. 4 (Code, Ann. Supp., § 2-6204), of the Constitution of 1945, which provides: "The appropriation for each department, officer, bureau, board, commission, agency or institution for which an appropriation is made, shall be for a specific sum of money, and no appropriation shall allocate to any object, the proceeds of any particular tax or fund or a part or percentage thereof." This provision was not contained in any Constitution of this State prior to 1945. Assuming, but not holding, that State Ports Authority is such a department of the State exercising essential governmental functions thereof that the legislature

would be legally authorized to appropriate funds from the treasury for its corporate purposes, we shall now deal with Acts 516 and 628 as they relate thereto.

Art. 3, sec. 7, par. 11, of the Constitution of 1945 provides: "No money shall be drawn from the treasury except by appropriation made by law." Code (Ann. Supp.), § 2-1911. Act 516 does not appropriate any specific amount which may be withdrawn from the treasury after the project or projects of the Authority are acquired or constructed for the "maintenance, repair, and operation" of same. The Authority by its resolution, its trust indenture, and recitals appearing in the face of its revenue bonds represents: "The Authority shall, and does hereby covenant for and on behalf of the State of Georgia, that if, in any fiscal year after the port project shall have been completed and placed in operation, the gross revenues therefrom shall not be sufficient to pay for the reasonable cost of maintaining, repairing, and operating such project under economical management and to place not less than $350,000 in the sinking fund for the payment of the principal of and the interest upon the bonds issued under the provisions of section 108 of this indenture, the State of Georgia will pay to the Authority, for the credit of the revenue fund, from the general funds of the State of Georgia, a sum equal to the amount of the cost of maintaining, repairing, and operating such project, or a sum equal to the amount by which such costs of maintenance, repair, and operation plus the sum of $350,000 exceeds such gross revenues, whichever sum shall be the smaller." Counsel for the plaintiff in error in oral argument to this court and by brief submitted in the case virtually concede that Act No. 516 is meaningless and violative of that provision of the constitution which requires all appropriations from the treasury to be for a specific amount. In the brief it is said: "It is not contended that Act No. 516 forces or requires any future legislature to appropriate any sums of money or requires the levying of any additional taxes for the maintenance, operation, and repair of State docks. Unless such appropriations are made by future legislatures, there will be no funds to carry out Act No. 516. Frankly, it appears that Act 516 is nothing more nor less than an expression of the legislative policy, as it is about to embark on the program of developing the ports of this State, to maintain and keep in repair its properties just as it does its highways and public

institutions. This policy may or may not be followed or changed by future legislatures." The act does not purport to be an appropriation from the treasury of funds necessary to pay the annual cost of maintaining, repairing, and operating the facilities of the Authority after they are acquired or constructed. It amounts to no more than a commitment by the State that future legislatures will make necessary appropriations for that purpose.

The effect of this act, as we see it, is to pledge the good faith and credit of the State for the payment of money in the future and to prevent free legislation thereafter, which the legislature had no right to do. No one legislature has the right to tie the hands of its successors with reference to a subject upon which they have an equal power to legislate. *Walker* v. *McNelly,* 121 *Ga.* 114 (4), 120 (48 S. E. 718); *Pierce* v. *Powell,* 188 *Ga.* 481, 484 (4 S. E. 2d, 192). The State's good faith is a valuable asset, and there is no law which authorizes the legislature to pledge it for the payment of money in future years. Act No. 516 gives the Authority the right to "covenant for and on behalf of the State of Georgia for the payment by said State of the cost of maintaining, repairing, and operating any project or projects acquired or constructed under the provisions of this act, in their entirety or to the extent provided by such resolution, and such resolution shall have the force of contract between the State and holders of said bonds issued for such project or projects;" and to say this is not an effort to tie the hands of future legislatures and to pledge the good faith and credit of the State is simply to "juggle with words."

Insofar as the act undertakes to commit future legislatures to make appropriations sufficient to pay, in whole or in part, the cost of maintenance, repair, and operation of the Authority's facilities, it is null and void.

By Act No. 628 the Governor was authorized to set aside the rentals arising from the lease of the Western & Atlantic Railroad from January 1, 1950, to the expiration of the lease, to the credit of a special treasury fund for the use and benefit of State Ports Authority, and to draw his warrant or warrants against that fund payable to the Authority. The act further provided that the rentals when received by the Authority should be applied toward the payment of its refunding bonds. Since the adoption of the Constitution of 1877 the legislature has frequently by appropriation

allocated to different departments of the State the funds derived from various sources. As a matter of State history, such practices in the field of financing the State government have proven unsatisfactory and too frequently an injustice to other departments. Assuming that the rentals here involved could legally have been set apart under the Constitution of 1877 for the purpose for which they are now sought to be appropriated and allocated, it becomes necessary to examine the Constitution of 1945 to ascertain if this may now lawfully be done. The present Constitution made substantial changes in reference to handling the fiscal affairs of the State. It sought to close loopholes which the old Constitution had left open. Art. 7, sec. 9, of the Constitution of 1945 provides:

Par. I. "The Governor shall submit to the General Assembly, within fifteen days after its organization, a budget message accompanied by a draft of a General Appropriation Bill, which shall provide for the appropriation of the funds necessary to operate all the various departments and agencies, and to meet the current expenses of the State for the ensuing fiscal year." Code (Ann. Supp.), § 2-6201.

Par. II. "Each General Appropriation Act, with such amendments as are adopted from time to time, shall continue in force and effect for each fiscal year thereafter until repealed or another General Appropriation Act is adopted; provided, however, that each section of the General Appropriation Act in force and effect on the date of the adoption of this Constitution, of general application and pertaining to the administration, limitation, and restriction on the payment of appropriations, and each section providing for appropriations of Federal grants and other continuing appropriations and adjustments on appropriations, shall remain in force and effect until specifically and separately repealed by the General Assembly." Code (Ann. Supp.), § 2-6202.

Par. III. "In addition to the appropriations made by the General Appropriation Act and amendments thereto, the General Assembly may make additional appropriations by acts, which shall be known as supplementary appropriations acts, provided no such supplementary appropriation shall be available unless there is an unappropriated surplus in the State Treasury or the revenue necessary to pay such appropriation shall have been provided by a tax laid for such purpose and collected into the General Fund of the State Treasury." Code (Ann. Supp.), § 2-6203.

Par. IV. (Code, Ann. Supp., § 2-6204.)

Par. V. "Any appropriation made in conflict with either of the foregoing provisions shall be void." Code (Ann. Supp.), § 2-6205.

The appropriation and allocation here made by the act under attack was not contained in the general appropriation act then of force, or in any amendment thereto, neither was it a supplementary appropriation of unappropriated funds in the treasury, nor of taxes which had been laid for the purpose of the act and collected into the treasury; and for these reasons it is unconstitutional.

■ Since the acts attacked are so manifestly unconstitutional, as we have held in the two preceding divisions of this opinion, we deem it unnecessary to deal with the other attacks made upon their constitutionality. *Judgment affirmed. All the Justices concur.*