BYARS *v.* CITY OF GRIFFIN *et al.*

No. 6585.    FEBRUARY 14, 1929.

44

50

*Beck & Beck, Roland Ellis,* and *Hall, Grice & Bloch,* for plaintiff.

*Cleveland & Goodrich,* for defendants.

ATKINSON, J. ■ The ruling announced in the first headnote does not require elaboration.

■ The proposed contract begins with certain preliminary statements explanatory of the reasons for making it. In sections 1 to 6 the company agrees to construct and equip, under the city's supervision and with its approval, the pumping and transmission system to be paid for and owned by the company. The city is to continue to own and maintain its existing system of waterworks, so that it may be used as a distributing system. The two systems are to be physically connected, so that they may be jointly operated for the purpose of drawing water from the river and distributing it to users of water in the city and its suburbs. The city agrees to pay the company the sum of $100,000 "on or before the first day of January, 1929, out of funds now in the treasury of the city." Section 7, which has several subdivisions, provides that as soon as the pumping and transmission system is completed the city will "lease" it and operate both systems jointly for a period of years, on a basis of division of the net profits from the joint operation, in the ratio of 10 per cent. to the city and ninety per cent. to the company, the last-named amount to be annually applied to payment of principal and interest as it should become due on bonds of the company running through a period of twenty years. The ninety per cent. is based on an estimated cost to the company for the

construction and equipment of the pumping and transmission system at $400,000; but as soon as the actual cost can be ascertained, the annual payments shall be adjusted so as to net the company a sum sufficient to pay six per cent. dividends on the capital stock, and interest on the six per cent. bonds *actually issued,* and to retire the bonds at the end of twenty years. It is provided, however, that the city "shall have the right to pay as much in excess of said sum each year as it desires, the same to be used to pay said interest and retire the bonds as provided in the charter." In subsection (g) of section 7, considered in connection with subsection (a), the city shall not be required to pay for water used for fire protection, flushing sewers, and other public purposes, unless the annual income for the preceding calendar year "does not equal the sum necessary to pay the principal and interest on said bonds maturing during such year." In the event of such failure of income, the city shall pay for such water such sum as shall be "sufficient to insure the company" the amount "necessary to pay the principal and interest on said bonds maturing during such year." And moreover, in the event of the failure of income as above stated and failure of the city to make good the deficit, the company shall have the right to terminate the agreement, after thirty days notice, before expiration of the twenty years. In section 9, which also has subsections, it is provided that in the event the company should terminate the agreement under subsection (g) of section 7, the company and the city shall continue to observe the provisions of the contract except that the lease of the property shall be from year to year.

In section 8 the city is given an "option, at any time within the life of this contract, to purchase the company's interest in the pumping and transmission system," and its properties "for a sum sufficient to discharge the company's outstanding obligations, to retire its outstanding bonds with accrued dividends, and to pay the expenses of dissolving the corporation, including one thousand ($1,000) dollars to be distributed to the holders of the common stock, with accrued dividends as provided in the charter. And upon the exercise of the option, and the payment of the purchase-price, the company shall convey to the city all of its properties and assets." And further, "whenever the amounts paid the company as provided in sec. 7 hereof have been sufficient to retire the bonds with all accrued interest, and to pay the expenses of dis-

solving the corporation, including one thousand dollars ($1,000) and accrued dividends to be distributed to the holders of the common stock, and the assumption of the city of all outstanding obligations incurred in the operation of the joint enterprise, the company will convey to the city, free from all liens, all of its properties and assets." In section 10 it is provided that in the event the city fails or refuses or is unable to carry out "either of the plans and agreements outlined in sections 7 and 9" then "the city hereby gives the company an option . . to purchase the electric light and waterworks systems and plants of the city, together with the complete franchise necessary to operate, maintain, extend, and modify said system and plants, so as to operate and maintain an adequate and complete waterworks plant, and an adequate and complete electric light and power plant in and for the City of Griffin, its inhabitants, and its suburbs," upon terms which included: (a) that the company will comply with its obligations outlined in sections 1, 3, 4, and 5 of the contract; and (b) the company will pay to the city all sums received by it from the city under sections 2, 7, and 9 of this instrument, except so much thereof as is necessary to pay the accrued dividends of six per cent. on the outstanding bonds, and such as may be necessary to restore the depreciation (if any) of the pumping and transmission system. The meaning and intent is that the company (before exercising the option to purchase) shall pay to the city the excess in the fair market value of the pumping and transmission system over the par value of the outstanding bonds and one thousand dollars, represented by the common stock, "in payment and satisfaction of an equity that the city might have acquired in the pumping and transmission system under sections 2, 7, and 9;"• (c) that the company shall agree to furnish the city and its inhabitants with an adequate supply of good, pure, filtered drinking water, and an adequate and complete electric light plant and system at fair and reasonable rates to be agreed upon, or fixed by arbitration.

From the foregoing statements it is obvious that the primary purpose and plan of the city was to acquire, in its own right and title, the pumping and transmission system. It could not raise sufficient funds by direct issue of its own bonds, because when added to its existing bonded indebtedness the amount would exceed the constitutional limit of seven per cent. of the assessed value of all

the taxable property in the city. So resort was had to the plan of organizing the water company with a capital stock of one thousand dollars, to construct and equip what may be termed a four-hundred-thousand-dollar water system. The plan involved financing the water company by the city, by advancing $100,000 from available funds in the treasury, and by making the contract to jointly operate the two systems, and pay to the company ninety per cent. of the net profits, upon the basis of which the company would sell its bonds to pay for the proposed water system, and the bonds would be retired in twenty years by annual payments of principal and interest. When the bonds should be retired and the stockholders reimbursed for their one thousand dollars of capital stock, the city should have a deed to all the property. The company did not intend primarily to engage in the water-supply business, this being manifested by the provisions in its charter, and also in the proposed contract that when all the bonds should be paid the corporation should be dissolved. Many of the provisions of the contract look to the security of the parties and to the security of bondholders, but they do not alter the primary purpose of the parties that the city should ultimately become owner of the property. In these circumstances the obligations of the city to the company amounted in substance to a debt within the meaning of the clause of the constitution quoted in the first syllabus. If it be said that the city was not obliged to take the property, or, taking the property, it was not to be paid for by taxation, that would not alter the case. The city wanted the property, and would advance from the city treasury $100,000 of the amount necessary to obtain it, and would employ the city's distributing plant and operate the joint enterprise to pay the balance in the future. If the city should not perform its obligations, and should fail to make the payments as specified in the contract, it would not get the property. This would result in defeat of the city's policy to own its water system, and entail other losses. The effect of the transaction was to constitute the city's obligation to make the future payments—by whatever name called—in substance a debt within the meaning of the constitution.

The constitutional limitation upon municipal power to create debts can not be circumvented by a plan to acquire a water system by expenditure of a large amount of available funds in the treas-

ury and by making promises to pay the balance of the cost in future years, either from the treasury or from profits to be derived from operation of the business. It has been held in effect by this court that anticipated profits of the character mentioned can not be the basis for incurring an obligation without creating a debt. *Tate* v. *Elberton*, 136 *Ga.* 301 (4) (71 S. E. 420). The question of what would create a debt within the meaning of the constitution was elaborately discussed in *Renfroe* v. *Atlanta,* 140 *Ga.* 81 (78 S. E. 449, 45 L. R. A. (N. S.) 1173). A number of authorities were therein cited, relating to colorable schemes to avoid constitutional restrictions upon municipal power in relation to debt. It is unnecessary to refer specifically to those authorities, but it will be illuminating to read them. The third note of the syllabus in that case is as follows: "A contract was entered into by the City of Atlanta and a private corporation, whereby the latter agreed to erect a crematory for the former, for a total price of $376,800, of which it was agreed that an installment of $50,000 should be paid in the year in which the contract was made, and that the balance should be paid in installments of $75,000 each, except the last, extending through a series of years; that the installments to be paid annually should bear interest at the rate of six per cent. from the time when they fell due; that the city pledged its good faith for their payment; that the term 'good faith' was understood to mean that the city could not bind itself to pay beyond the current year, but the mayor and general council of that year by resolution recommended to the mayor and general council of succeeding years to make appropriations to cover the deferred payments specified in the contract; and that, if a default in the payment by the city of any future installment of the purchase-money should be made, this should, without any legal process whatever, transfer the possession of the plant to the contractor company, and that the company should 'immediately become vested with the title, possession, and control of said plant, exclusive of the land, as against the City of Atlanta, and said company shall have the right to operate the same free of rent, for its own account, for a period of ten years from the date of such default.' *Held,* that by such contract it was sought to create a debt within the meaning of the constitutional provision on that subject set out in the first headnote."

In the opinion it was said: "It is impossible to read this

contract and these resolutions without seeing plainly that the intention of the parties was for the city to contract for the building and equipping of a crematory at a fixed price, a part of which was to be provided for and paid in 1912 and much the larger part of which was to be paid in installments in subsequent years; and that it was sought at least to pledge the good faith of the city for the payment of the future installments. It went even further; it provided that if any installment should not be paid, the company should at once be vested with the title, possession, and control (except as to the land), and that it should have the right to operate the plant for ten years for its own account, free of rent. Thus the city might pay every installment but the last one; but if the council in that year conscientiously and correctly believed that the contract was illegal, and refused to violate the law as they saw it, the city would have neither its money nor a crematory. This would be to apply not only moral but pecuniary coercion to future councils to force them to pay or lose and to take from the city its crematory and put it in the hands of the other party, by virtue of the terms of the contract. To say that this creates no debt within the meaning of the constitution is simply to juggle with words. We know of no law which authorizes a city council to pledge the good faith of the city for the payment of money in future years, any more than to mortgage the city hall for the same purpose."

Again it was said: "When read in the light of the facts of the case 'then under discussion, there is nothing in the decision in *City Council of Dawson* v. *Dawson Waterworks Company* [106 *Ga.* 696, 32 S. E. 907], or other cases preceding or following it, decided by this court, on which counsel for defendants in error rely, which conflicts with what is here held. Much stress was ·laid upon the following statement in the opinion of Mr. Justice Cobb in that case (106 *Ga.* 711) : 'Debt therefore, as used in the constitution, is to be understood as a liability which is undertaken and which must be discharged at some time in the future, but which is not to be discharged by a tax levied within the year in which the liability is undertaken. The purpose of the framers of the constitution was to prevent an accumulation of liabilities upon municipal corporations which could be enforced against such corporations in the future by the compulsory levy of taxes. . . If the character of the undertaking is such that he who deals with a municipal corporation can,

under the contract, in the future, of his own volition, and without the consent and over the protest of the authorities of the municipality, place upon it a liability which must be dicharged by the levy of a tax in the future, such an undertaking creates a debt within the meaning of the constitution of this State, and one of the very classes of debts which the constitutional provision was made to guard against.' The learned judge who wrote that opinion declared that if a contract could be made by which a contracting party had the right from year to year, by simple performance, to put himself in a position where he could demand of the authorities a discharge of the obligation, then the framers of the constitution did a vain and idle thing in placing in the fundamental law of the land the clause under consideration. A fair reading of that opinion will show that Mr. Justice Cobb was demonstrating the fact that an agreement of the character then before him did create a debt, but that he never intended to hold that such an agreement was the only one that would create a debt. The expression that such an undertaking was 'one of the very classes of debts which the constitutional provision was made to guard against' shows that he did not consider that the constitution was confined to the particular class which he was then discussing. We have already undertaken to show that it is not essential that one should have the right to sue in order to create a debt; otherwise the State would never be a debtor as to individual bondholders, though it has millions of dollars worth of bonds outstanding. It is not the remedy that creates the debt, but the remedy is generally a method provided for collecting the debt. The substitution of the contractual remedy in lieu of the ordinary remedy by suit does not operate to prevent the amount which is to be collected from being a debt."

Again it was said: "In this State, as already mentioned, it has been held that a municipal corporation could not contract for a supply of water on the credit of the city for a longer period than one year, without the preliminary sanction of a popular vote as required by the constitution. In the case last mentioned and others like it, where the city could have contracted for a supply of water for one year at a time, though the contract provided for more than one year, yet where the city actually used the water by the year, and all parties were acting in good faith, there was strong equitable ground for holding that during the time the water was

so used, and before any question was made as to the validity of the contract, the water used should be paid for. From the time when the point was made that the contract for a series of years was invalid, it was held not to be binding as a contract. Had the point been made in limine, it would doubtless have been then declared invalid, just as it was so declared when the point was raised. . . The difference between the situation of the Dawson Waterworks Company as to water which it had furnished for the use of the city before any question was raised as to the validity of the contract, and the position of this company which has entered into a contract illegal on its face and has persistently insisted on its execution, is manifest." In the foregoing excerpt a distinction was noted between the case under consideration, where the suit was commenced after executing the contract but before anything was done under it, and the *Dawson Waterworks* case therein referred to, where the city had received benefits under it. The same distinctions would apply in the present case, the suit having been brought even before execution of the contract and before the city had received any benefits under it.

In *McCrary Co.* v. *Glennville,* 149 *Ga.* 431 (100 S. E. 362), it was held: "Where a contractor enters into a contract with a municipal corporation for the construction and equipment of a light and water plant under a written agreement whereby some of the contract price is to be paid in instalments through a series of years after the contract is completed, the effect of such contract is to create a debt within the meaning of article 7, section 7, paragraph 1, of the constitution of this State (Civil Code, § 6563), which limits the power of municipalities to contract debt, and is prohibited by that provision of the constitution. . . Where the contract also provides for retention of title in the contractor until the contract price is fully paid, for delivery of the plant after its completion to the municipality as lessee, and for a rental of one dollar per annum until all the deferred payments for the contract price have been made, which when done shall cause title to the property to vest immediately in the municipality, the contract is one of conditional sale as distinguished from a mere lease. *Hays* v. *Jordan,* 85 *Ga.* 741 (11 S. E. 833, 9 L. R. A. 373); *Ross* v. *McDuffie,* 91 *Ga.* 120 (16 S. E. 648); *North* v. *Goebel,* 138 *Ga.* 739 (76 S. E. 46)."

The plan involved in the present case for raising the funds for purchase of the pumping and transmission system of waterworks under consideration was fashioned after a plan adopted under similar circumstances in the City of Decatur, Illinois. In a suit involving the transaction referred to, the question was raised as to whether the obligations of the city amounted to the creation of a debt within the meaning of the constitution of that State, very similar to the constitution of this State, limiting the power of the municipality to create a debt, quoted above in this opinion. Maffit v. Decatur, 322 Ill. 82 (152 N. E. 602). It was held by the Supreme Court of Illinois that the obligations under consideration did not amount to a debt of the city within the meaning of the constitution. On this point it was said: "The only absolute and fixed right under the contract is that of the city to flood the land of the water company for a certain rate of compensation to be paid out of the water rates derived from the consumers of water residing in the city. There is no showing by appellant that an indebtedness is or will be created by this method of paying the water company, which exceeds or will exceed the constitutional limit for the city. No obligation is imposed upon the city to pay the water company's compensation. If in any given year the company should fail to realize as its share of the water rates the minimum prescribed by the contract, no liability on the part of the city to pay the deficit would arise. The city might choose to pay the deficit; but if it refused to do so, no suit to recover it could be maintained by the company." This part of the decision of the Supreme Court of Illinois is opposed to the views hereinabove expressed. However, it is not controlling, and is out of harmony with the principles announced by this court in *Renfroe* v. *Atlanta,* supra, and *McCrary Co.* v. *Glennville,* supra.

*Judgment reversed. All the Justices concur, except Russell, C. J., dissenting.*