WILLIAMSON *v.* HOUSING AUTHORITY OF AUGUSTA
                              *et al.*

674

No. 12519.  SEPTEMBER 21, 1938.

*Lee, Congdon & Fulcher,* for plaintiff.

*Henry G. Howard, William T. Gary, Spalding, Sibley, Trout-man & Brock,* and *W. K. Meadow,* for defendants.

GRICE, Justice.  A. R. Williamson filed his petition seeking to enjoin the Housing Authority of the City of Augusta and the City Council of Augusta from proceeding with the development and financing of a proposed slum-clearance and low-rent housing project for that city.  The action was dismissed on general de-

murrer, and the plaintiff excepted. The petition attacks the constitutionality of the act approved March 30, 1937 (Ga. Laws 1937, p. 210), known as the housing-authorities law, and also the housing-co-operative law (Ga. Laws 1937, p. 697). The contract between the Housing Authority of the City of Augusta and the United States Housing Authority is set forth, the latter acting in pursuance of the Federal housing act (42 U. S. C. A. 1401 et seq.). The contract sets forth, among other things, that the United States Housing Authority will purchase from the local authority its bonds, these bonds to be secured only by a pledge of the income of the property itself which is to be acquired from the proceeds of the sale of these bonds and from a pledge of the annual subsidy which is made by the United States Housing Authority to the local authority. The bonds are not secured by a deed or lien upon the physical properties of the project. The contract expressly provides that the indenture securing the bonds shall not confer a power of foreclosure, and shall prohibit the sale or other disposition of the project. It is also provided that the United States Housing Authority will make an annual contribution to the Housing Authority of the City of Augusta in a sum not to exceed $58,555 each year for a period of sixty years, which constitutes 3½ per cent. of the entire estimated development cost of the project, plus ten per cent. The bonds draw 3 per cent. interest and are payable in annual installments running from two to sixty years. The annual interest on all of the bonds to be issued by the local authority is $50,190, based on the aggregate amount of bonds of $1,673,000. The rents derived from the operation of the project will be utilized to pay ordinary operating expenses and repairs, and to supplement the annual contributions for the payment of the principal and interest on the bonds. Section 17 of the contract provides, that, "pursuant to the provisions of the United States Housing Act of 1937, the faith of the United States Government is pledged to the payment of the annual contributions contracted for under this agreement, and appropriations are authorized to be made in each fiscal year out of any money in the treasury not otherwise appropriated, in the amounts necessary to provide for such payments."

The housing-authorities law (Ga. L. 1937, p. 210) declares, that there exist in this State insanitary and unsafe dwelling ac-

commodations, and that persons of low income are forced to reside in such unsafe accommodations; that there is a shortage of safe dwelling accommodations available at rents which persons of low income can afford, and that they are forced to occupy overcrowded dwellings which cause an increase in the spread of disease and crime and constitute a menace to the health, safety, morals, and welfare of the residents of the State, and impair economic values, necessitating excessive and disproportionate expenditures of public funds for crime prevention and punishment, public health and safety, fire and accident protection, and other public services. The General Assembly further declared that these slum areas can not be cleared, nor can the housing shortage for persons of low income be relieved through private enterprise, and that such clearance and reconstruction of safe and sanitary dwelling accommodations for persons of low income are public uses and purposes. This law provides for the creation of public bodies corporate, and authorizes such bodies to acquire and operate housing projects and to finance such properties by issuing bonds secured either by pledge of the income and revenue from the housing projects or a mortgage on the properties. The authorities are expressly authorized to borrow money or accept grants or other financial assistance from the Federal government. The statute is substantially like those adopted in many other States, and is designed to enable these local housing authorities to attain their objects by means of assistance from the Federal Housing Authority. The housing co-operation law (Ga. L. 1937, p. 697) is designed to enable municipalities to co-operate and assist housing authorities and authorize certain advances and assistance. It further creates a State Housing Authority Board, which must approve all housing projects undertaken within the State.

■ The plaintiff's first specific ground of attack is that the two Georgia acts here involved constitute class legislation, contrary to article 1, section 1, paragraph 2, of the constitution of this State (Code, § 2-102), which declares that "Protection to person and property is the paramount duty of government, and shall be impartial and complete." The argument is that the actual benefits to be derived from the proposed slum-clearance and low-cost housing project are limited to those individuals or families "who lack the amount of income which is necessary to enable

them, without financial assistance, to live in safe and sanitary dwellings without overcrowding," and that thus the housing act provides special privileges and advantages for a particular group to be selected from persons occupying a certain economic and financial status, to the exclusion of other citizens who by arbitrary standards occupy a different situation. It might also be claimed that the actual benefits derived from maintaining the Georgia Academy for the Blind are limited to blind children; or that the actual benefits of the Georgia State Sanitarium are limited to those mentally diseased; or that adults are denied the actual benefits of the public-school system because the schools are maintained only for children between certain ages; and that therefore, since they provide privileges and advantages only for a particular group, their maintenance by the State is contrary to our organic law. It is no violation of the constitutional guaranty here invoked for the State to provide direct benefits for a certain group, to the exclusion of other citizens, unless done by arbitrary standards. The governing authorities were well justified in limiting to those of moderate income the benefits of the legislation under discussion. The statute makes a classification and states the basis thereof, which can not be said by this court to be unreasonable.

■ It is contended that said acts do not have uniform operation, but apply to cities having populations of 5,000 or more, and therefore that they violate article 1, section 4, paragraph 1, of the constitution (Code, § 2-401), which in part declares that "Laws of a general nature shall have uniform operation throughout the State, and no special law shall be enacted in any case for which provision has been made by an existing general law." Counsel, while conceding the right of the General Assembly to classify, provided the classification be natural, not arbitrary, take the position that the classification undertaken by the General Assembly in the passage of these acts does not bear a reasonable relation to the result sought to be accomplished, and therefore can not be upheld. From the very nature of this legislation and its purpose, to limit it to cities having a population of 5,000 or more is not an arbitrary classification. The size of the population of a community or city furnishes a legitimate ground of differentiation. It is a well-known fact that slum conditions and congestion in housing are more acute in the larger cities.

■ It is insisted that the acts refer to more than one subject-matter, and contain matter different from that expressed in the title, contrary to article 3, section 7, paragraph 8, of the constitution (Code, § 2-1808), which declares that "No law or ordinance shall pass which refers to more than one subject-matter or contains matter different from what is expressed in the title thereof." Particularizing, counsel for the plaintiff contends that the housing law of Georgia offends that section, for the reason that it refers to more than one subject-matter by referring to the following, to wit: The creation of a State Housing Authority Board; the creation of provision for method of creating a body corporate to be known as a "Housing Authority;" the exemption of property from taxation; provisions relative to the enforcement of the right of eminent domain. Also, that said act further violates such constitutional limitation, in that it contains the following matters which are not expressed in the title, to wit: Provision for the enforcement of the right of eminent domain by the Housing Authority; exemption of property of said housing authority from levy and sale under execution; aid to said Housing Authority by loan or grant from the Federal government; the provision that the bonds of said Housing Authority shall not be debts of the State, county, or city; the provision authorizing the Housing Authority to conduct investigations, hearings, to issue subpœnas, and require the production of documents before it; and that the Housing co-operation law is in violation of such constitutional provisions, for the reason that it refers to more than one subject-matter, in that it refers to the creation and organization of a State Housing Authority Board, defining its authority; the authorization of cities to aid and contribute to local housing authorities; the mandatory provision that cities shall contribute to the first year's expenses of local housing authority; and that said housing co-operation law further violates such constitutional limitation in that it contains the following matters, which are not expressed in the title, to wit: The authorizing of cities, counties, or territorial divisions of the State to lend money to said housing authorities; and the portion of section 7 of said act providing that resolutions of governing bodies of cities, counties, or other subdivisions of the State shall take effect immediately, and need not be laid over or published or posted. Each of the subjects dealt with in the hous-

ing law (Ga. L. 1937, p. 210) and the housing co-operation law (Ga. L. 1937, p. 697) is definitely related to the main subject-matter of the act. Unity of purpose is what the constitution requires of legislative enactments; if there is only one general subject-matter, an act is not open to the objection of plurality because it enters into details, provided all parts of the enactment have a natural connection and relate to the main object of the legislation. Compare *Churchill* v. *Walker,* 68 *Ga.* 681, 686; *Columbus Southern Railway Co.* v. *Wright,* 89 *Ga.* 574 (15 S. E. 293); *McCommons* v. *English,* 100 *Ga.* 653 (28 S. E. 386); *Starnes* v. *Mutual Loan & Banking Co.,* 102 *Ga.* 597 (29 S. E. 452); *Brand* v. *Lawrenceville,* 104 *Ga.* 486 (30 S. E. 954); *Welborne* v. *State,* 114 *Ga.* 793 (40 S. E. 857); *Pearson* v. *Bass,* 132 *Ga.* 117 (63 S. E. 798); *Nolan* v. *Central Georgia Power Co.,* 134 *Ga.* 201 (67 S. E. 656); *Mayes* v. *Daniel,* 186 *Ga.* 345 (198 S. E. 535).

In *Central of Georgia Railway Co.* v. *State,* 104 *Ga.* 831 (31 S. E. 531, 42 L. R. A. 518), it was said: "What the constitution looks to is unity of purpose. It does not mean by one subject-matter only such subjects as are so simple that they can not be subdivided into topics; but it matters not how many subdivisions there may thus exist in a statute or how many different topics it may embrace, yet if they all can be included under one general comprehensive subject which can be clearly indicated by a comprehensive title, such matter can be constitutionally embodied in a single act of the legislature." The general purpose of the housing statutes of the State, to which reference has been made, is to create public corporations the functions of which are to engage in slum clearance by establishing sanitary and wholesome housing projects in cities of a stated size and class, with the view of promoting health and sanitation and prevention and spread of crime and disease. This being the main and primary purpose of the legislation, it could not have been complete without defining the powers and duties of such authorities, and the ways and means of their exercise of the powers so conferred. The statutes are not open to the criticism that they refer to more than one subject-matter. Nor can the objection be sustained that they contain matter different from what is expressed in their titles. The title of an act need only indicate the general object and subject-matter to be dealt with. It is not required that the title contain a synopsis

680

of the law. *Wright* v. *Fulton County,* 169 *Ga.* 354 (2-*a*) (150 S. E. 262) and cit. In *Cady* v. *Jardine,* 185 *Ga.* 9 (193 S. E. 869), it was said: "It was never intended that the substance of the entire act should be set forth in the caption. It was not contemplated that every detail stated in the body should be mentioned in the caption. If what follows after the enacting clause is definitely related to what is expressed in the title, has a natural connection, and relates to the main object of legislation, and is not in conflict therewith, there is no infringement of the constitutional inhibition." Then after quoting the title, or a portion of it, the court said: "Any provision in the body which is germane to this general purpose as embraced in the title would not be violative of the constitutional provision."

An assault is made on the two acts because it is claimed that they delegate to the cities and counties of this State certain powers which are non-delegable legislative powers; and the plaintiff invokes article 3, section 1, paragraph 1, of the constitution (Code, § 2-1201), which declares that "The legislative power of the State shall be vested in a General Assembly, which shall consist of a Senate and House of Representatives." The contention is that the housing-authorities law by its terms attempts to delegate non-delegable legislative powers in the following particulars: 1. To the mayors of certain cities in the State, to create public corporate housing authorities. 2. To the governing boards of said authorities, to determine the type, nature, and extent of the projects to be undertaken, the locations thereof, the amount of bonds to be issued thereon, and other like matters, including the power of eminent domain, the power of acquisition of land, and tax exemptions. There is nothing in the housing-authority law which attempts to delegate to the mayors of certain cities the power to create public corporate housing authorities. The General Assembly, in section 4 of the act, expressly creates the housing authority of the city, and then provides that "such authority shall not transact any business or exercise its powers hereunder until and unless the governing body of the city or the county, as the case may be, by proper resolution shall declare at any time hereafter that there is need for an authority to function in such city or county." The only connection the mayor has with this is stated in section 5, to wit: "When the governing body of a city adopts a resolution as afore-

said, it shall promptly notify the mayor of such adoption. Upon receiving such notice, the mayor, by and with the consent of the Governor, shall appoint five persons as commissioners of the authority created for said city." Nor in the provision giving to the governing boards certain powers, as above pointed out, is there any violation of the rule forbidding attempted delegation of non-delegable legislative powers. Having declared the purposes of the act, and enacted provisions to carry the same into effect, the General Assembly could properly confer on the governing board of the authority the powers of which complaint is made. Compare *Georgia Railroad* v. *Smith,* 70 *Ga.* 694; *Southern Ry. Co.* v. *Melton,* 133 *Ga.* 277 (65 S. E. 665). The tariff act of September 21, 1922, empowered and directed the President to increase or decrease duties imposed by the act, so as to equalize the differences which, upon investigation, he finds and ascertains between the costs of producing at home and in competing foreign countries the kind of articles to which such duties apply. The act laid down certain criteria to be taken into consideration in ascertaining the differences, fixed certain limits of change, and made an investigation by the Tariff Commission, in assisting the President to ascertain the differences, a necessary preliminary to any proclamation changing the duties. The Supreme Court of the United States, holding that the delegation of power was not unconstitutional, quoted approvingly from Wilmington & Zanesville Railroad Co. *v.* Commissioners, 1 Ohio St. 77, 88, as follows: "The true distinction, therefore, is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring an authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first can not be done; to the latter no valid objection can be made." Hampton *v.* United States, 276 U. S. 394, 407 (48 Sup. Ct. 348, 72 L. ed. 624).

■ It is asserted that the achievement of the project will necessitate the taking of private property in violation of the due-process clause of the State constitution and of the fourteenth amendment to the Federal constitution. The argument advanced is, that, as a result of the construction and operation of the proposed housing units, rental property in Augusta, including that of the plaintiff, will be rendered less valuable; that by the terms of the act

the rentals to be charged for the new units shall be such as the tenants can afford to pay; that since such tenants will consist only of persons of low income, the natural consequence is that the rent level will be so low as to undermine the basis and destroy the standards by which private property can be so rented as to produce a fair return over cost of maintenance; that the proposed entry by the government into such field of real-estate development and operation will be destructive of private property rights, in violation of the State and Federal constitutions: that the act requires cities and counties to levy and collect taxes for the purpose of defraying certain initial costs of the project and otherwise aiding in its development; that the plaintiff's property will be called on to bear its proportionate burden of these additional taxes, with no compensating benefits; and that the housing authority proposes to purchase various parcels of real estate which are now subject to taxation; that upon the acquisition of that property by the authority it becomes exempt from all forms of taxation and will be removed from the tax digests, causing a substantial loss in the public revenue. A like argument could be made by a property owner whenever the city takes over activities of the kind originally carried on by private enterprise; but, so far as we are advised, it has never been held by any court that such a position was maintainable. The suggestion that the competition of this housing project will deny to the plaintiff due process is completely answered by a recent decision of the Supreme Court of the United States, in which it was held that a distributor of electricity under a non-exclusive franchise was not denied any constitutional right by competition from municipalities erecting power plants with funds loaned by Federal agencies. It was held: "The claim that petitioner will be injured, perhaps ruined, by the competition of municipalities brought about by the use of the moneys, therefore presents a clear case of damnum absque injuria. Stated in other words, these municipalities have the right under the State law to engage in the business in competition with petitioner, since it has been given no exclusive franchise. If its business be curtailed or destroyed by the operations of the municipalities, it will be by lawful competition, from which no legal wrong results." Alabama Power Co. *v.* Ickes, 302 U. S. 464 (58 Sup. Ct. 500, 82 L. ed. 263).

■ It is insisted that said acts and the contracts made pursuant thereto provide for debts to be incurred by a municipality and other political divisions of the State, in violation of the restriction and prohibition contained in article 7, section 7, paragraph 1, of the constitution (Code, § 2-5501), counsel's position being that the legislative design in enacting the housing law is to circumvent that constitutional limitation, in that a debt will be incurred which will be an obligation of the City Council of Augusta, and of a political division of the State, within the meaning of the constitution. In support of the view that the contracts here involved create a debt of the city, counsel rely on *City of Dawson* v. *Dawson Waterworks Co.*, 106 *Ga.* 696 (32 S. E. 907); *Renfroe* v. *Atlanta*, 140 *Ga.* 81 (78 S. E. 449, 45 L. R. A. (N. S.) 1173); *Byars* v. *Griffin*, 168 *Ga.* 41 (147 S. E. 66); *Dortch* v. *Southeastern Fair Association*, 182 *Ga.* 633 (186 S. E. 685); *Cartledge* v. *Augusta*, 183 *Ga.* 414 (188 S. E. 675). The *Dawson Waterworks* case seems not to be particularly in point, although it is perhaps our leading case on what is a debt of a municipal corporation within the meaning of our constitution. The holding, from which Simmons, Chief Justice, dissented, was that the making of a contract by municipal authorities for gas or water for a term of years, for a certain sum to be paid annually, was a debt within the meaning of the constitution. In the instant case, the municipality has entered into no agreement to make payments over a term of years. The only agreement on behalf of the municipality of Augusta is that it agrees to eliminate unsafe or unsanitary dwelling units of a number equal to or greater than 340, either by demolishing dwellings on lands acquired by the city by purchase or otherwise, or by causing the compulsory demolition, or by inducing private owners to voluntarily eliminate such dwellings. This contract is presumed to be made for a lawful purpose, and therefore is not construed as binding the municipality to do any act or to engage in any undertaking, financial or otherwise, with respect to elimination of such dwellings, contrary to what it should do in any event under the public power. Nor can it be construed as an obligation on its part to eliminate dwellings which should not be eliminated for a purpose within the police power. Manifestly the city could not bargain away the discretion which it should exercise within the police power for the general welfare;

and therefore the contract can mean nothing more than an assurance, unnecessary perhaps, that the city will do what it should do. If any other construction would lead to the conclusion that the contract is illegal, then it should be construed as stated above, in view of the presumption that it is for a legal purpose. There is an allegation in an amendment to the petition that the City Council of Augusta has already appropriated and used certain sums of money out of the general funds of said City of Augusta for the use and benefit of said housing authority, and that unless enjoined the city council will proceed under the terms of section 6 of an act of the General Assembly, approved March 31, 1937, referred to as the "housing co-operation law" (Ga. L. 1937, pp. 697-702), to appropriate further sums of money out of the general funds of the city for the purpose of paying the necessary administrative expense and overhead of the housing authority during its first year of operation, and will proceed to enter into contracts for payment for services with the housing authority, and will otherwise appropriate, dedicate, and use property, funds, and assets of the city for the use of the housing authority, pursuant to the housing co-operation law. This does not, however, indicate that the City of Augusta is about to incur any debt on that account, the allegation being that the city council will, unless enjoined, appropriate certain sums from the general funds of the city—presumably from funds on hand.

The *Renfroe* case, supra, is clearly distinguishable. Interpreting the contract there dealt with, the court said: "It is impossible to read this contract and these resolutions without seeing plainly that the intention of the parties was for the city to contract for the building and equipping of a crematory at a fixed price, a part of which was to be provided for and paid in 1912 and much the larger part of which was to be paid in installments in subsequent years; and that it was sought at least to pledge the good faith of the city for the payment of the future installments. It went even further; it provided that if any installment should not be paid, the company should at once be vested with the title, possession, and control (except as to the land), and that it should have the right to operate the plant for ten years for its own account, free of rent. Thus the city might pay every installment but the last one; but if the council in that year conscientiously

and correctly believed that the contract was illegal, and refused to violate the law as they saw it, the city would have neither its money nor a crematory. This would be to apply not only moral but pecuniary coercion to future councils to force them to pay or lose and to take from the city its crematory and put it in the hands of the other party, by virtue of the terms of the contract. To say that this creates no debt within the meaning of the constitution is simply to juggle with words. We know of no law which authorizes a city council to pledge the good faith of the city for the payment of money in future years, any more than to mortgage the city hall for the same purpose. The city's good faith is a great asset, and no council has the right to pledge it to evade the constitution. Certainly no council has the right to admit that it can not bind future councils, and yet to fix payments for future councils to make, and so arrange the contract that, if the future councils do not make the payments, moral and pecuniary loss will automatically fall upon the city, and it will be put to serious inconvenience." Nothing of that kind appears in the case now before us. In *Byars* v. *Griffin*, supra, this court followed the *Renfroe* case. In discussing the contract there dealt with, it was said that it was "the primary purpose of the parties that the city should ultimately become owner of the property. In these circumstances the obligations of the city amounted in substance to a debt within the meaning of the clause of the constitution." In that connection it was said: "The city wanted the property, and would advance from the city treasury $100,000 of the amount necessary to obtain it, and would employ the city's distributing plant and operate the joint enterprise to pay the balance in the future. If the city should not perform its obligations, and should fail to make the payments as specified in the contract, it would not get the property. This would result in defeat of the city's policy to own its water system, and entail other losses. The effect of the transaction was to constitute the city's obligation to make the future payments—by whatever name called—in substance a debt within the meaning of the constitution."

The decision in *Cartledge* v. *Augusta*, supra, was planted on the cases of *Renfroe* v. *Atlanta*, and *Byars* v. *Griffin*, supra. We quote from the opinion: "The city does not pay any money out of its treasury into the construction of the hydroelectric plant and

distribution system. But the Augusta canal, the present property of the City of Augusta, and the water therefrom, will be an important part of the hydroelectric plant, without which the plant could not operate. The income from the sale of electric power generated by the plant can not in any sense be considered as produced solely by the power-house, generator, turbine, and transmission lines, exclusive of the 'canal and water therein. The fact that at the present time the city may be deriving no income from the surplus water in the canal is, in our opinion, immaterial. The canal and the water are valuable property of the city. Other property .will be combined with them to produce income from the whole. But the income from the entire development, canal, water, and hydroelectric generating plant, and the distribution system, is charged with the payment of the revenue bonds to be issued and sold for the purpose of constructing the plant and system." The scheme there attempted contained the same infirmity as that dealt with in the *Renfroe* case. In both the *Dortch* and *Cartledge* cases, it appeared that the city would pledge the income from municipal property previously owned. Nothing of that kind appears here, nor does the feature of coercion enter into it. *Morton* v. *Waycross,* 173 *Ga.* 298 (160 S. E. 330), is another case which on its facts was controlled by the principles applied in the *Renfroe* and *Byars* cases. It was there ruled that the sale of the equipment and its installation at a time when "the city has not surplus funds with which to pay and has not levied any tax for such purpose" would create a debt within the meaning of the constitution. In principle, the decision in *State* v. *Regents of the University System,* 179 *Ga.* 210 (175 S. E. 567), followed approvingly in *Williams* v. *McIntosh County,* 179 *Ga.* 735 (177 S. E. 248), ruled adversely to the plaintiff on the point now under consideration. In the *Regents* case, it was said: "The Regents of the University System of Georgia is a distinct corporate entity and is governed by a Board of Regents. Through the board it can exercise any power usually granted to such incorporations, necessary to its usefulness, and not in conflict with the constitution and laws. An obligation incurred by the corporation, or the Board of Regents, is not a debt of the State, and therefore is not affected by constitutional limitations upon State indebtedness." Also; "The loan agreement as made by the corporation and its

Board of Regents with the Federal government under which bonds will be issued by the Regents and purchased by the government for the purpose of providing funds for stated university uses, the bonds to be paid exclusively out of described special funds, does not involve any illegal undertaking on the part of the Board of Regents, and is within the powers granted to the corporation and its Board of Regents by the laws of this State. The court properly refused to enjoin the execution of such agreement." What was said in the opinion on the vital question there considered applies with equal force here. We quote an extract: "In the first division of this opinion we have disposed of the question whether the obligations would create a debt against the State, and in the briefs filed for defendants it is maintained that such obligations would not even create a debt against the regents as a corporation. This for the reason that the bonds do not constitute general obligations, but are payable only out of special funds. In the view which we take of the case it is unnecessary to decide whether in these circumstances a 'debt' will be created against the corporation. Whatever the nature of the particular obligation, it is our opinion that the board of regents, or the corporation as the case may be, is vested with sufficient authority to issue the bonds and to obtain the loan upon the conditions agreed upon. The buildings are to be erected on the lands of the corporation, and the title to the buildings will be in the corporation from the time of their construction, ownership by the corporation not being dependent upon any condition, not even the payment of the loan. No mortgage or other lien is created, and the only stipulation which in any manner contemplates a lien is the statement which specifies the income to be pledged. None of the other property or resources can ever be held liable, and all possible remedies must be aimed at such special income. Such remedies as the government may preserve in the agreement of indenture will, of course, be limited to the rights conferred by that instrument, which is to be in accord with the loan agreement." The contract invoked in the instant case is of the type dealt with in the *Regents* case.

The *Renfroe, Byars, Cartledge,* and *Morton* decisions construed, not an act of the General Assembly, but contracts entered into by virtue of municipal ordinances. In the instant case we are

dealing with solemn acts of the General Assembly and a contract of the city expressly authorized by a legislative act. In such a case courts will not, unless satisfied beyond a reasonable doubt, rule that the statutes and the contract made thereunder are an attempt to circumvent the constitution. On their face they do not run counter to the constitution; and we will not ascribe to the lawmakers of the State a purpose to circumvent the provisions of that instrument.

■ Finally, the acts and the contracts made thereunder are attacked on the following grounds: (a) The achievement of the project will necessitate the taking of private property in violation of the due-process clause of the State constitution and the fourteenth amendment to the constitution of the United States. (b) The proposed housing project is not for a public purpose, but is for private use, and the tax exemptions and other privileges and immunities conferred upon the housing authority are in violation of the constitution. (c) The right of eminent domain granted to the housing authority by the acts is violative of the constitution. (d) Said acts make it mandatory upon cities and counties to appropriate money, loan credit to and make service contracts with the housing authority, although such authority is not a corporation organized for purely charitable purposes. (e) Said acts undertake to delegate to the counties of this State the right to levy and collect taxes for purposes other than those authorized by the constitution.

The proposed project should not be stricken down for any of these reasons; provided the use to which the property to be acquired is put is legitimately a public use for public purposes. Whether it is or not is the controlling question. Under the constitution, article 7, section 2, paragraph 2 (Code, § 2-5002), "The General Assembly may by law exempt from taxation all public property; . . all institutions of purely public charity." A testator devised to trustees certain real estate, the annual rents to be appropriated by them for the erection of a poorhouse in Richmond County, and for the support of its inmates. No poorhouse had been erected, but the trustees were accumulating a fund for the purpose. The property was assessed for taxes. The trustees sought injunction. This court held that the poorhouse when erected would be exempt, but not detached property from

which its support is derived, and said: "No matter to whom the institutions belong, whether to a private individual, to a corporation, or to an unincorporated company or association, they are equally exempt, provided they are dedicated to charity and used exclusively as institutions of purely public charity. Hospitals, almshouses, asylums for the insane, for the deaf and dumb, or the blind, orphan asylums, homes of various kinds, soup-houses, etc., permanently established and open, without charge, to the whole public, or to the whole of the classes for whose relief they are intended or adapted, are institutions of the exempt order, irrespective of their ownership, and without regard to whether they have behind them, or connected with them, any institution in the personal or ideal sense of the term, or not. That the word 'institution,' both in legal and colloquial use, admits of application to physical things, can not be questioned. One of its meanings, as defined in Webster's Unabridged Dictionary, is 'an establishment, especially of a public character, affecting a community.' And one of the meanings of 'establishment,' as defined by the same authority, is 'the place in which one is permanently fixed for residence or business; residence with grounds, furniture, equipage, etc., with which one is fitted out; also, any office or place of business, with its fixtures.'" *Trustees of the Academy of Richmond County* v. *Bohler*, 80 *Ga.* 159 (7 S. E. 633).

The recent decision of *Tharpe* v. *Central Georgia Council of Boy Scouts of America*, 185 *Ga.* 810 (196 S. E. 762), dealt with the question whether or not property used as a boy-scout camp was exempt from taxation on the ground that it was dedicated to charity. In the opinion it was said: "Under the statute, 'the following described property shall be exempt from taxation, to wit: . . all institutions of purely public charity.' Code, § 92-201. The test is whether the property itself is 'dedicated to charity and used exclusively' as an institution of purely public charity. 'The exemption from taxation of institutions of public charity, provided for by the constitution, is of such institutions as property not as persons,—the physical things, not the ideal institutions.' . . The character of the plaintiff corporation, as disclosed by its charter provisions and the other evidence, will be considered, of course, in determining whether the use of the property is such as to exempt it from taxation. Cf. *Elder* v. *Atlanta-Southern Dental*

*College,* 183 *Ga.* 634 (189 S. E. 254). A familiar meaning of the word 'charity' is almsgiving, but as used in the law it may include 'substantially any scheme or effort to better the condition of society or any considerable part of it.' Wilson *v.* Independence First National Bank, 164 Iowa, 402 (145 N. W. 948, Ann. Cas. 1916D, 481). 'Charity,' as used in tax exemption statutes, is not restricted to the relief of the sick or indigent, but extends to other forms of philanthropy or public beneficence, such as practical enterprises for the good of humanity, operated at moderate cost to the beneficiaries, or enterprises operated for the general improvement and happiness of mankind.' 61 C. J. 455, § 505. This court has said: 'The property of a Young Men's Christian Association, used solely for purposes of public charity, *using the term "charity" in its broad sense,* is not taxable, provided its income is not used, nor intended to be used, as dividends or profits;' " citing *City of Waycross* v. *Waycross Savings & Trust Co.,* 146 *Ga.* 68 (4) (90 S. E. 382). It is expressly provided in section 9 of the housing-authorities law that the housing project shall not be operated for profit. In a somewhat analogous case in Massachusetts, dealing with the question whether or not a corporation organized to provide a home for working girls was a charitable institution, the court said: "Though not paupers, they are so poor as to make it a work of charity to provide for them a home. The individuals of the class change from day to day. They are sufficiently numerous, and so a part of the public, and so connected with it and with the public welfare, as to give to the work of providing a home for any individuals comprised in the class that quality of indefiniteness in the persons helped, which, with the charitable purpose aimed at, makes a public charity in the legal sense." Franklin Square House *v.* Boston, 188 Mass. 409 (74 N. E. 675).

We are of the opinion that the exemption from taxation contended for can be sustained on the general ground that the project is a purely public charity within the meaning of the constitutional provision, even if it were not public property. The fact that a small amount of rent is to be charged does not change its character. *Linton* v. *Lucy Cobb Institute,* 117 *Ga.* 678 (45 S. E. 53); *Brewer* v. *American Missionary Association,* 124 *Ga.* 490 (52 S. E. 804); *Hurlbutt Farm* v. *Medders,* 157 *Ga.* 258 (121 S. E. 321).

Applying the principles ruled in the *Tharpe* case, supra, the contemplated project is for purely charitable purposes; and therefore the provision in section 6 of the housing co-operation law, which provides that the city shall, out of any money in its treasury not otherwise appropriated, appropriate to the authority an amount of money necessary to cover the administrative expense and overhead during first year, the act further declaring that said money so appropriated shall be paid as a donation, is not violative of article 7, section 6, paragraph 1, of the constitution (Code, § 2-5401), which among other things declares that the General Assembly shall not authorize any municipality to appropriate money to any corporation "except for purely charitable purposes." In so far as section 6 of the act refers to the making of loans or donations by the city after the first year, the authority to do so is not made mandatory, but merely permissive. If the project under attack is for public purposes, and the property about to be acquired by it is for public purposes, then the property may be exempted from taxation, and its bonds, being instrumentalities of government, are non-taxable. Property may be public property so as to come within the exemption from taxation although the legal title is not in the State, the county, or a municipality. Compare *Trustees of the Academy of Richmond County* v. *Augusta,* 90 *Ga.* 634 (17 S. E. 61, 20 L. R. A. 151). See also *Walden* v. *Whigham,* 120 *Ga.* 646 (48 S. E. 159). Public property, within the meaning of that clause of the constitution which authorizes the General Assembly to exempt from taxation all public property, embraces only such property as is owned by the State, or some political division thereof, and title to which is vested directly in the State, or one of its subordinate political divisions, or in some person holding exclusively for the benefit of the State, or a subordinate public corporation. *Board of Trustees of Gate City Guard* v. *Atlanta,* 113 *Ga.* 883 (39 S. E. 394, 54 L. R. A. 806). Bonds issued by a municipality of this State are not taxable by this State or any county thereof. The bonds are merely government instrumentalities and are not taxable by the force of the constitution itself. *Penick* v. *Foster,* 129 *Ga.* 217, 225 (58 S. E. 773, 12 L. R. A. (N. S.) 1159, 12 Ann. Cas. 346).

In Darman *v.* Philadelphia Housing Authority, 331 Pa. 209 (200 Atl. 834), the Supreme Court of Pennsylvania, in a case similar to

this, held that the grant to the housing authorities of the right of eminent domain did not violate a provision in the constitution of that State similar to the one in the Georgia constitution on the subject, and added that "The public nature of the use of the property also justifies the exemption granted by the act from State and local taxation." It was also ruled that the act did not contain two subject-matters, or matter different from that expressed in the title; was not class legislation because limited to cities of a certain size; nor did the act involve any unconstitutional delegation of power; the provisions of the Pennsylvania act being almost identical with the Georgia act. The Florida Supreme Court, on a similar record in Marvin v. Housing Authority, (Fla.), 183 So. 145, made like rulings as to the right of eminent domain, and as to the creation of a debt by the city, and expressed the same view as we have, as to tax exemptions. In Wells v. Housing Authority, 213 N. C. 744, 197 S. E. 693, it was held that the property acquired by a housing authority was exempt from taxation, since the property was held for a public purpose. In New York City Housing Authority v. Muller, 270 N. Y. 333 (1 N. E. 153), it was held that the fact that the project was limited to persons of low income did not make the use private instead of public. If the use is a public use, the power of eminent domain conferred by the act is legitimate. "The exercise of the right of eminent domain shall never be abridged." Constitution, art. 4, sec. 2, par. 2 (Code, § 2-2502). "The right of eminent domain is the right of the State, through its regular organization, to reassert . . its dominion over any portion of the soil of the State on account of public exigency and for the public good." Code, § 36-101. "It is the province of the legislature to judge of the exigencies requiring the exercise of this right; but if, under the pretext of such necessity, the property of one is taken for the private use of another, the courts should declare the law inoperative." § 36-102. This right may be exercised through the medium of corporate bodies. § 36-103.

In *Jones* v. *North Georgia Electric Co.*, 125 *Ga.* 618, 625 (54 S. E. 85, 6 L. R. A. (N. S.) 122, 5 Ann. Cas. 526), this court had before it the question whether or not an act which conferred upon owners of water powers the right of eminent domain, was an attempt to take property from an owner, against his will, for other than a public purpose. In upholding the act, the opinion

stated with approval the general rule evolved by Judge Cooley in ascertaining the character of the use, as follows: "The reason of the case and the settled practice of free governments must be our guides in determining what is or is not to be regarded a public use; and that only can be considered such where the government is supplying its own needs, or is furnishing facilities for its citizens in regard to those matters of public necessity, convenience, or welfare, which, on account of their peculiar character, and the difficulty—perhaps impossibility—of making provision for them otherwise, it is alike proper, useful, and needful for the government to provide." See Fallbrook Irrigation Dist. v. Bradley, 164 U. S. 112, 160-164 (17 Sup. Ct. 56, 41 L. ed. 369); Mt. Vernon-Woodberry Cotton Duck Co. v. Alabama Power Co., 240 U. S. 30 (36 Sup. Ct. 234, 60 L. ed. 507). The right of the city to establish and maintain an ice plant was upheld in *Holton* v. *Camilla*, 134 *Ga.* 560 (68 S. E. 472, 31 L. R. A. (N. S.) 116, 20 Ann. Cas. 199), and in *Saunders* v. *Arlington*, 147 *Ga.* 581 (94 S. E. 1022, Ann. Cas. 1918D, 907). The act authorizing the creation of drainage districts was upheld because founded on the principle of public benefit. *Almand* v. *Pate*, 143 *Ga.* 711 (85 S. E. 909). The act requiring appropriations for the building of a cyclorama and museum was declared valid, the requirement having reference to the performance of a governmental function. *McClatchey* v. *Atlanta*, 149 *Ga.* 648 (101 S. E. 682). So also the building of an airport, the main purpose of which was to facilitate travel and transportation for public convenience and general welfare. *McGinnis* v. *McKinnon*, 165 *Ga.* 713 (141 S. E. 910); *Swoger* v. *Glynn County*, 179 *Ga.* 768 (177 S. E. 723). As stated by Stern, J., in the Pennsylvania case cited above: "A legislative project of this nature goes beyond anything heretofore attempted in this State. It naturally invites, therefore, the attack of those who are inclined to regard all experiments in our social and economic life as presumptively unconstitutional. Such challenges must fail, however, if upon analysis it appears that the only novelty in the legislation is that approved principles are applied to new conditions. Neither our State nor our Federal constitution forbids changes, merely because they are such, in the nature or the manner of use of methods designed to enhance the public welfare; they require only that the new weapons em-

ployed to combat ancient evils shall be consistent with the fundamental scheme of government of the commonwealth and the nation, and shall not violate specific constitutional mandates."

The application to the facts of this case of the general rule stated in several of the Georgia cases last cited, and recognized in all of them, leads us to the conclusion that the legislation here under attack must be sustained against the criticism that it does not deal with a public purpose. See also Block *v.* Hirsh, 256 U. S. 135, 155 (41 Sup. Ct. 458, 65 L. ed. 865) ; Jones *v.* Portland, 245 U. S. 217 (38 Sup. Ct. 112, 62 L. ed. 252) ; Green *v.* Frazier, 253 U. S. 233 (40 Sup. Ct. 499, 64 L. ed. 878). On similar statutes a like conclusion was reached in Green *v.* Frazier, 44 N. Dak. 395 (176 N. W. 11) ; Willmon *v.* Powell, 91 Cal. App. 1 (266 Pac. 1029) ; Spahn *v.* Stewart, 268 Ky. 97 (103 S. W. (2d) 651) ; State ex rel. *v.* Housing Authority, 190 La. 710, 182 So. 725.

The judge did not err in sustaining the demurrer.

*Judgment affirmed. All the Justices concur, except*

RUSSELL, C. J., and ATKINSON, P. J., who dissent from the ruling in division 8, as to tax exemption.